

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/238,115 | 09/10/2002 | William O'Keeffe | OKEF-07982US1 DBB/SRM | 6410 |

23910        7590        11/01/2005

FLIESLER MEYER, LLP
FOUR EMBARCADERO CENTER
SUITE 400
SAN FRANCISCO,. CA  94111

| EXAMINER |
|---|
| CHEN, VIVIAN |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1773 | |

DATE MAILED: 11/01/2005

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C  (Rev. 10/03)

| | Application No. | Applicant(s) |
|---|---|---|
| ***Office Action Summary*** | 10/238,115 | O'KEEFFE, WILLIAM |
| | Examiner | Art Unit | |
| | Vivian Chen | 1773 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) FROM
THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed
  after SIX (6) MONTHS from the mailing date of this communication.
- If the period for reply specified above is less than thirty (30) days, a reply within the statutory minimum of thirty (30) days will be considered timely.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any
  earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on <u>18 July 2005 and 19 July 2005</u>.

2a)☒ This action is **FINAL**.      2b)☐ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is
closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) <u>1-3,8,17,18 and 21-25</u> is/are pending in the application.

　　4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) <u>1-3,7,17,18 and 21-25</u> is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.

10)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.

　　Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

　　Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

　　a)☐ All  b)☐ Some * c)☐ None of:

　　　1.☐ Certified copies of the priority documents have been received.

　　　2.☐ Certified copies of the priority documents have been received in Application No. _____.

　　　3.☐ Copies of the certified copies of the priority documents have been received in this National Stage
application from the International Bureau (PCT Rule 17.2(a)).

　　* See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)

2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3)☐ Information Disclosure Statement(s) (PTO-1449 or PTO/SB/08)
Paper No(s)/Mail Date _____.

4)☐ Interview Summary (PTO-413)
Paper No(s)/Mail Date. _____.

5)☐ Notice of Informal Patent Application (PTO-152)

6)☐ Other: _____.

Application/Control Number: 10/238,115                                             Page 2
Art Unit: 1773

**DETAILED ACTION**

*Claim Rejections - 35 USC § 103*

1.      Claims 1-3, 8, 17-18, 21-25 are rejected under 35 U.S.C. 103(a) as being unpatentable

over:

      SAKAMOTO ET AL (US 5,230,954) or SAKAMOTO ET AL (US 5,624,761).

      in view of Applicant's admissions.

      SAKAMOTO ET AL '954 or '761 discloses an impact resistant, fire resistant laminates

comprising a fire resistant polymeric film adhered to a first wire glass sheet, wherein an optional

second wire glass sheet can be further bonded to the first wire glass sheet. (SAKAMOTO ET AL

'954, Figures 1-2; line 53, col. 2 to line 10, col. 3) (see corresponding portions of SAKAMOTO

ET AL '761)  However, the references do not explicitly disclose the recited impact resistance.

      Applicant admits that current minimum safety glazing standards require an impact

resistance of at least 100 ft-lbs (Applicant's Specification, page 1, paragraph 0008).

      It would have been obvious to a person of ordinary skill in the art at the time the

invention was made to select the thickness and mechanical properties of the various layers in

SAKAMOTO ET AL '954 or '761 in order to obtain sufficient impact resistance to meet or

exceed established safety standards (claims 1, 17, 24). It is well known in the art to incorporate

known colorants in polymer films used in glazing applications (claim 8) in order to obtain

specific aesthetic or light filtering effects.  One of ordinary skill in the art would have applied a

known heat-reflective layer such as metal to a fire resistant glazing film in order to minimize

heat transmission through the glazing structures (claims 22-23).

Application/Control Number: 10/238,115                                    Page 3
Art Unit: 1773

2.      Claims 22-23 are rejected under 35 U.S.C. 103(a) as being unpatentable over:

        (a) SAKAMOTO ET AL (US 5,230,954) or SAKAMOTO ET AL (US 5,624, 761).

in view of Applicant's admissions;

        as applied to claim 1 above,

        and further in view of FARMER ET AL (US 4,973,511).

        FARMER ET AL discloses that it is well known in the art to apply thin metal coatings

comprising stainless steel or other metals to polymeric films for use in safety glazing

applications in order to minimize heat transmission through the glazing (lines 45-60, col. 2; lines

64-66, col. 3; lines 30-35, col. 5)

        It would have been obvious to one of ordinary skill in the art at the time the invention

was made to apply a known heat-reflective layer such as metal to a fire resistant glazing film in

order to minimize heat transmission through glazing structures (claims 22-23).


                                    *Response to Arguments*

3.      Applicant's arguments filed 7/19/2005 have been considered but are moot in view of the

new ground(s) of rejection.


                                    *Allowable Subject Matter*

4.      Claims 3, 18 are objected to as being dependent upon a rejected base claim, but would be

allowable if rewritten in independent form including all of the limitations of the base claim and

any intervening claims.

Application/Control Number: 10/238,115                                    Page 4
Art Unit: 1773

5.    The following is a statement of reasons for the indication of allowable subject matter:

The prior art of record fails to disclose or suggest fire resistant safety glass laminates consisting

essentially of a wire glass sheet and a fire resistant PET film, with said laminate having the

recited impact resistance (claims 3, 18).

### *Conclusion*

6.    Applicant's amendment necessitated the new ground(s) of rejection presented in this

Office action. Accordingly, **THIS ACTION IS MADE FINAL**. See MPEP § 706.07(a).

Applicant is reminded of the extension of time policy as set forth in 37 CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action. In the event a first reply is filed within TWO

MONTHS of the mailing date of this final action and the advisory action is not mailed until after

the end of the THREE-MONTH shortened statutory period, then the shortened statutory period

will expire on the date the advisory action is mailed, and any extension fee pursuant to 37

CFR 1.136(a) will be calculated from the mailing date of the advisory action. In no event,

however, will the statutory period for reply expire later than SIX MONTHS from the date of this

final action.

Application/Control Number: 10/238,115                                          Page 5
Art Unit: 1773

7.      Any inquiry concerning this communication or earlier communications from the examiner should be directed to Vivian  Chen whose telephone number is (571) 272-1506.  The examiner can normally be reached on Monday through Thursday from 8:30 AM to 6 PM.  The examiner can also be reached on alternate Fridays.

        If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Carol Chaney, can be reached on (571) 272-1284. The fax phone number for the organization where this application or proceeding is assigned is (571) 273-8300.

        The General Information telephone number for Technology Center 1700 is (571) 272-1700.

        Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system.  Status information for published applications may be obtained from either Private PAIR or Public PAIR.  Status information for unpublished applications is available through Private PAIR only.  For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).

October 28, 2005

Vivian  Chen
Primary Examiner
Art Unit 1773

US005462805A

# United States Patent [19]

## Sakamoto et al.

[11] **Patent Number:** **5,462,805**

[45] **Date of Patent:** **Oct. 31, 1995**

[54] **FIRE-PROTECTION AND SAFETY GLASS PANEL**

[75] Inventors: **Akihiko Sakamoto; Tadashi Takahashi; Masayuki Ninomiya**, all of Shiga, Japan

[73] Assignee: **Nippon Electric Glass Co., Ltd.**, Otsu, Japan

[21] Appl. No.: **99,226**

[22] Filed: **Jul. 29, 1993**

[30] **Foreign Application Priority Data**

Jul. 30, 1992 [JP] Japan ..................................... 4-223470

[51] Int. Cl.$^6$ ..................................................... **B32B 9/00**

[52] **U.S. Cl.** .......................... **428/430**; 428/215; 428/410; 428/426; 428/480; 428/911; 428/913; 428/920

[58] **Field of Search** ..................................... 428/458, 432, 428/437, 141, 524, 480, 215, 412, 410, 426, 911, 913, 920; 526/87

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,900,673 | 8/1975 | Mattimoe et al. | 428/339 |
| 4,358,329 | 11/1982 | Masuda | 156/106 |
| 4,382,996 | 5/1983 | Mori et al. | 428/442 |
| 4,910,074 | 3/1990 | Fukawa et al. | 428/215 |
| 4,911,984 | 3/1990 | Parker | 428/428 |
| 4,952,460 | 8/1990 | Beckmann et al. | 428/429 |
| 5,002,820 | 3/1991 | Bolton et al. | 428/215 |
| 5,091,258 | 2/1992 | Moran | 428/437 |
| 5,091,487 | 2/1992 | Hori et al. | 526/87 |
| 5,145,746 | 9/1992 | Tomoyuki | 428/458 |
| 5,219,630 | 6/1993 | Hickman | 428/38 |
| 5,230,954 | 7/1993 | Sakamoto et al. | 428/332 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 684017 | 7/1966 | Belgium | . |
| 1905619 | 8/1970 | Germany | . |
| 480276 | 12/1969 | Switzerland | . |

*Primary Examiner*—Patrick J. Ryan
*Assistant Examiner*—William A. Krynski
*Attorney, Agent, or Firm*—Hopgood, Calimafde, Kalil & Judlowe

[57] **ABSTRACT**

In a fire-protection and safety glass panel having a transparent appearance and dual functions as a fire protection glass for shutting out flame and smoke for a long period of time upon occurrence of fire and as a safety glass which is neither shattered into pieces and nor forms any through hole if it is broken in an ordinary life, a PET (polyethylene terephthalate) film (12) is arranged between a first glass plate (10) and a second glass plate (11). The first and the second glass plates (10 and 11) are adhered through transparent acrylic adhesive agent layers (13 and 14), respectively. An intermediate resin layer comprises the PET film (12) and the adhesive agent layers (13 and 14) and has a thickness between 75 and 200 µm.

**14 Claims, 3 Drawing Sheets**





# FIG. 1



51        52

## FIG. 2



62

63

61

## FIG. 3



HEAT CURVE FOR FIRE-RESISTING TEST

# FIG. 4

5,462,805

1

## FIRE-PROTECTION AND SAFETY GLASS PANEL

### BACKGROUND OF THE INVENTION

This invention relates to a fire-protection and safety glass panel which serves as a fire-protection panel upon occurrence of fire and as a safety glass panel in an ordinary life.

With recent increase of large-sized architectures such as multistory buildings, department stores, and supermarkets, there is a demand for a fire-protection and safety glass panel having dual functions as a fire protection panel for shutting out flame and smoke upon occurrence of fire to thereby suppress the spread of the fire at a minimum and as a safety glass panel which is neither shattered into pieces and nor forms a through hole if it is broken in an ordinary life.

A conventional fire-protection panel comprises a low-expansion crystallized glass plate, a borosilicate glass plate, or a wire mesh glass plate (a wire glass plate). On the other hand, a conventional safety glass panel comprises a laminated glass plate including a plurality of soda lime glass plates and a transparent polyvinyl butyral film or films (PVB film) joined by thermocompression bonding to provide a structure which comprises a plurality of glass plates with an intermediate resin layer or layers interposed therebetween. Another conventional safety glass panel comprises a soda lime glass plate with an antishattering film applied on a surface thereof. However, a fire-protection and safety glass panel which has both a fire protection function and a safety function has not yet been known.

If the safety glass panel is heated upon occurrence of fire, it is thermally cracked to form a through hole. In particular, when the above-mentioned laminated glass plate is heated, the PVB film is decomposed to produce a combustible gas. The gas is blown to a nonheated side and inflamed to accelerate the spread of the fire. For thermocompression bonding of the transparent film, a large-sized heating furnace is required so that the laminated glass plate is completely received therein. Furthermore, when a plurality of the glass plates have different thermal expansion coefficients and the PVB film is thermocompression bonded to the glass plates to provide an intermediate resin layer therebetween, a warp is caused to occur due to the difference in contraction of the glass plates during cooling.

On the other hand, the low-expansion crystallized glass plate or the borosilicate glass plate used as the fire protection panel is easily broken due to mechanical impact in the ordinary life to be shattered into pieces or dropped off. The wire mesh glass plate has a safety effect to some extent. However, if the glass plate is subjected to a great impact, for example, due to strong collision of a human body, a wire mesh will be cut off to form a through hole. In this event, the human body may be injured.

There are known incombustible transparent films such as a fluoric resin film. However, this film is very expensive and slightly opaque. Accordingly, it is difficult to obtain a laminated glass panel having a high transparency. In addition, this film is poor in evenness. When this film is adhered to the glass plate, air bubbles easily enter into a gap formed therebetween. It is therefore difficult to obtain a transparent appearance.

### SUMMARY OF THE INVENTION

It is therefore an object of this invention to provide a fire-protection and safety glass panel having dual functions as a fire-protection glass panel for shutting out flame and smoke for a long period of time on occurrence of fire and as

2

a safety glass which is neither shattered into pieces nor forms a through hole if it is broken in an ordinary life.

It is another object of this invention to provide a fire-protection and safety glass panel of the type described, which has a transparent appearance.

It is still another object of this invention to provide a glass window comprising a fire-protection and safety glass panel having dual functions as a fire-protection glass panel for shutting out flame and smoke for a long period of time on occurrence of fire and as a safety glass panel which is neither shattered into pieces nor forms a through hole if it is broken in an ordinary life.

It is yet another object of this invention to provide a glass window of the type described, which comprises the fire-protection and safety glass panel having a transparent appearance.

It is a further object of this invention to provide a glass door comprising a fire-protection and safety glass panel having dual functions as a fire-protection glass panel for shutting out flame and smoke for a long period of time on occurrence of fire and as a safety glass panel which is neither shattered into pieces nor forms a through hole if it is broken in an ordinary life.

It is a still further object of this invention to provide a glass door of the type described, which comprises the fire-protection and safety glass panel having a transparent appearance.

Other objects of this invention will become clear as the description proceeds.

A fire-protection and safety glass panel to which this invention is applicable comprises a first glass plate, a second glass plate opposite to the first glass plate, and an intermediate resin layer between the first and the second glass plates. At least one of the first and the second glass plates is a heat-resistant glass plate.

According to this invention, the intermediate resin layer comprises a polyethylene terephthalate film and has a thickness which is not greater than 200 μm.

A glass window to which this invention is applicable comprises a fire-protection and safety glass panel and a sash for the fire-protection and safety glass panel. The fire-protection and safety glass panel comprises a first glass plate, a second glass plate opposite to the first glass plate, and an intermediate resin layer between the first and the second glass plates. At least one of the first and the second glass plates is a heat-resistant glass plate.

According to this invention, the intermediate resin layer comprises a polyethylene terephthalate film and has a thickness which is not greater than 200 μm.

A glass door to which this invention is applicable comprises a fire-protection and safety glass panel and a frame for the fire-protection and safety glass panel. The fire-protection and safety glass panel comprises a first glass plate, a second glass plate opposite to the first glass plate, and an intermediate resin layer between the first and the second glass plates. At least one of the first and the second glass plates is a heat-resistant glass plate.

According to this invention, the intermediate resin layer comprises a polyethylene terephthalate film and has a thickness which is not greater than 200 μm.

In order to achieve the above-mentioned objects, the present inventors have made extensive researches. As a result, it is found out that a material interposed in each gap between the first and the second glass plates must have a thickness not greater than a predetermined value. Even if the

5,462,805

3

material is combustible or fire-retarding and the combustible gas is blown to the nonheated side, the gas is prevented from being inflamed because its density is thin.

When a heat-resistant glass plate is used as at least one of the glass plates, a fire protection effect is improved to provide a function as a fire-protection panel. Furthermore, when the polyethylene terephthalate film is used as the material interposed in each gap between the first and the second glass plates, a sufficient safety effect is obtained even if the thickness is small. This is because the tensile strength is excellent upon reception of an impact.

According to this invention, the polyethylene terephthalate film (hereinafter referred to as a PET film) is used as a material of the intermediate resin layer. This is because the film is fire-retarding and excellent in transparency and evenness. In addition, the film can be formed into an extremely small thickness, specifically, not greater than 25 μm. Furthermore, this film is excellent in strength and little in extension so that a tensile strength is high even if the thickness is small.

As the heat-resistant glass plate used in this invention, use can be made of a low-expansion crystallized glass plate, a borosilicate glass plate, or a wire glass plate. Taking the transparency and the heat resistance into consideration, the low-expansion crystallized glass plate is preferable.

The low-expansion crystallized glass plate is of a crystallized glass which exhibits thermal expansion substantially equal to zero upon occurrence of fire. Specifically, a preferable crystallized glass has a composition consisting by weight of 3–5% $Li_2O$, 20–35% $Al_2O_3$, 55–70% $SiO_2$, 1–3% $TiO_2$, 1–4% $ZrO_2$, 1–5% $P_2O_5$, 0–4% $Na_2O$, 0–4% $K_2O$, 0.5–4% $Na_2O+K_2O$, precipitates β-quartz solid solution crystals, and has a thermal expansion coefficient between $-10\times10^{-7}/°$ C. and $15\times10^{-7}/°$ C. (30°–750° C).

According to this invention, at least one of the first and the second glass plates is a heat-resistant glass plate. Each of the other glass plates does not need to be a heat-resistant glass plate but may be a soda lime glass plate.

When the borosilicate glass plate or the soda lime glass plate is used in this invention, it is preferable to chemically or thermally reinforce the glass plate in order to improve the impact resistance.

The transparent adhesive agent used in this invention may be any appropriate material which is available at a low cost, excellent in transparency, and strong in adhesion so that a large-sized glass plate and the PET film can be strongly bonded. At present, only combustible and fire-retarding materials satisfy all of the above-mentioned properties. Taking a material cost and a workability into consideration, acrylic or vinyl transparent adhesive agents are preferable.

In order to prevent air bubbles from entering into a gap between the glass plate and the intermediate resin layer as little as possible, it is preferable to use a glass plate having a surface undulation not greater than 2 microns and to suppress a surface undulation of a transparent adhesive agent coated on the PET film to a value not greater than 2 microns.

According to this invention, at least one glass plate comprises a heat-resistant glass plate. When the glass plate is heated upon occurrence of fire, no through hole allowing passage of flame and smoke is formed during a predetermined period of time so that the spread of the fire can be avoided.

According to this invention, it is sufficient that at least one glass plate is a heat-resistant glass plate. Each of the other

4

glass plates does not need to be a heat-resistant glass plate but may be a soda lime glass plate.

According to this invention, each intermediate resin layer desirably has a thickness not greater than 200 μm, preferably, not greater than 100 μm. The reasons are as follows.

The first reason will be described. When the fire-protection and safety glass panel according to this invention is heated upon occurrence of fire, the PET film and the transparent adhesive agent forming the intermediate layer are decomposed to produce the combustible gas. If the intermediate resin layer has a thickness not smaller than 200 μm, a large amount of the combustible gas is produced so that the high-density gas is blown to the nonheated side. The gas will be inflamed by the heat of the fire to thereby spread the fire.

The second reason is as follows. When the fire-protection and safety glass panel according to this invention is heated upon occurrence of fire and the intermediate resin layer has a thickness not smaller than 200 μm, a large amount of the combustible gas will be produced as described above. This increases a pressure in the gap between the glass plates. Due to the pressure, the glass plate is easily broken.

The PET film is excellent in strength and little in extension. Accordingly, even if the thickness is small, the fire-protection and safety glass panel according to this invention has an excellent tensile strength. When the glass panel is subjected to an impact, deformation of the glass plate is suppressed and a high impact resistance is obtained.

BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 is a sectional view of a fire-protection and safety glass panel according to an embodiment of this invention;

FIG. 2 is a front view of a glass window using the fire-protection and safety glass panel illustrated in FIG. 1; and

FIG. 3 is a perspective view of a glass door using the fire-protection and safety glass panel illustrated in FIG. 1.

FIG. 4 is illustrative of a standard heating curve as prescribed in the Official Notification No. 1125 of the Ministry of Construction in Japan.

DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring to FIG. 1, a fire-protection and safety glass panel according to a preferred embodiment of this invention comprises a first glass plate 10, a second glass plate 11 opposite to the first glass plate, and an intermediate resin layer between the first and the second glass plates 10 and 11. At least one of the first and the second glass plates 10 and 11 is a heat-resistant glass plate. The intermediate resin layer comprises a polyethylene terephthalate film (namely, a PET film) 12 and first and second adhesive agent layers 13 and 14 and has a thickness which is not greater than 200 μm. The first adhesive agent layer 13 adheres the PET film 12 to the first glass plate 10. The second adhesive agent layer 14 adheres the PET film 12 to the second glass plate 11.

Each of the first and the second adhesive agent layers 13 and 14 is of either a silicone adhesive agent or an acrylic adhesive agent.

Each of the first and the second glass plates 10 and 11 is a transparent plate. The PET film 12 is a transparent film. Each of the first and the second adhesive agent layers 13 and 14 is a transparent layer.

The heat-resistant glass plate is of either a low-expansion

5,462,805

| 5 | 6 |

crystallized glass described above or a borosilicate glass. Alternatively, the heat-resistant glass plate is of a wire glass.

Table 1 shows structures and characteristics of this invention (Samples Nos. 1–3) and comparative examples (Samples Nos. 4–6).

The samples Nos. 1–5 in Table 1 have a structure illustrated in FIG. 1. The PET film 12 is held between the first glass plate 10 and the second glass plate 11. The glass plates 10 and 11 are adhered to the PET film 12 through transparent acrylic adhesive agent layers 13 and 14, respectively. Each of the samples Nos. 1–3 has the intermediate resin layer having a thickness of 75–200 μm while the samples Nos. 4 and 5 have intermediate resin layers having thicknesses of 200 μm and 250 μm, respectively.

Each of the samples Nos. 1–5 was prepared in a method which will presently be described.

At first, the transparent adhesive agent layer 13 was applied on one surface of the PET film 12. The adhesive-applied surface was brought into contact with one surface of the first glass plate 10. One ends thereof were inserted in a gap between two rubber rollers and then moved forward so that they were bonded together.

TABLE 1

| | This Invention | | | Comparative Example | | |
| | No. 1 | No. 2 | No. 3 | No. 4 | No. 5 | No. 6 |
|---|---|---|---|---|---|---|
| Glass Plate A | Crystallized Glass | Crystallized Glass | Crystallized Glass | Soda Lime Glass | Crystallized Glass | Borosilicate Glass |
| Glass Plate B | Soda Lime Glass | Soda Lime Glass | Borosilicate Glass | Soda Lime Glass | Borosilicate Glass | Soda Lime Glass |
| Transparent Film | PET | PET | PET | PET | PET | PVB |
| Thickness of Transparent Film (μm) | 25 | 50 | 100 | 100 | 200 | 300 |
| Transparent Adhesive Agent | Acrylic | Acrylic | Acrylic | Acrylic | Acrylic | — |
| Thickness of Adhesive Agent (μm) | 25 | 25 | 50 | 50 | 25 | — |
| Thickness of Intermediate Resin Layer (μm) | 75 | 100 | 200 | 200 | 250 | — |
| Appearance | Transparent | Transparent | Transparent | Transparent | Transparent | Transparent |
| Inflammation | None | None | Self-extinguish | Not Measured | Not Measured | Not Measured |
| Fire Protection Time (minutes) | >180 | >180 | >180 | 17 | 22 | 6 |
| Impact Resistance (cm) | 72 | 120 | 140 | 140 | 140 | 100 |
| Warp (%) | <0.2 | <0.2 | <0.2 | <0.2 | <0.2 | 1.5 |

Thereafter, the transparent adhesive agent layer 14 was applied on the other surface of the PET film 12. The adhesive-applied surface was brought into contact with one surface of the second glass plate 11. In the manner similar to the foregoing, they were bonded together.

The sample No. 6 has a structure comprising a borosilicate glass plate and a soda lime glass plate with a PVB film thermocompression bonded therebetween.

As the crystallized glass plate in the table, use was made of a transparent crystallized glass having a dimension of 2000×900×5 mm and a thermal expansion coefficient of −5×10⁻⁷/° C. (FIRELITE (trade name): manufactured by Nippon Electric Glass Co., Ltd.). As the soda lime glass plate, use was made of a glass plate formed into a plate shape by an ordinary float method and having a dimension of 2000×900×3 mm and a thermal expansion coefficient of 85×10⁻⁷/° C. As the borosilicate glass, use was made of a glass plate formed into a plate shape by an ordinary down draw method and having a dimension of 2000×900×3 mm and a thermal expansion coefficient of 30×10⁻⁷/° C.

As is obvious from the table, each of the samples Nos. 1–3 according to this invention had a transparent appearance. In a fire protection test, no inflammation was caused at the nonheated side or, if the inflammation was caused, it was immediately self-extinguished. In addition, the fire protection time was as long as 180 minutes or more. The impact resistance was excellent and the warp was small.

On the other hand, each of the samples Nos. 4, 5, and 6 had a transparent appearance and an excellent impact resistance. However, in the sample No. 4 using no heat-resistant glass plate, each glass plate was broken in the fire protection test to form through holes allowing passage of flame and smoke. With the samples Nos. 5 and 6, the gas was blown to the nonheated surface and spontaneously inflamed in the fire protection test so that the fire protection time was as small as 6–22 minutes. It was therefore unnecessary to test the inflammation for each comparative example. The samples Nos. 4 and 5 exhibited a small warp while the sample 6 exhibited a warp as large as 1.5%.

In the table, the appearance was visually observed.

The inflammation was measured as follows. Each sample was located with one surface faced to an electric heater of an area heating type. Heating was carried out in accordance with a standard heating curve illustrated in FIG. 4 as prescribed in Official Notification No. 1125 of the Ministry of Construction of Japan. After the lapse of three minutes from the start of heating, a gas lighter was occasionally brought close to the gas blown to the nonheated side while it was observed whether or not the inflammation was caused to occur. In case when the gas lighter was inflamed, "none" is indicated. In case when the gas lighter was inflamed but no flame was produced on the nonheated side of the sample after the gas lighter was separated apart from the sample, "self-extinguish" is indicated.

Japanese Notification No. 1125, which was effective as of Jun. 30, 1990, relates to the certification of fire doors constructed to have fire prevention properties.

The testing method is carried out generally on specimens of size and thickness substantially the same as the actual product. The specimen is dried in dry air. Both surfaces of the fire door, depending on the type, are heated in a furnace for a time ranging from about 20 to 60 minutes, the temperature being measured by a chromel/alumel thermocouple, at least 9 thermojunctions being used to measure the heating temperature, the thermojunctions being uniformly spaced on the heating surface.

A successful test is one in which the specimen does not generate flames or form heating gaps or cracks when the backside of the surface is exposed to heat. In addition, an acceptable specimen should not generate smoke from the back side of the heated surface, etc.

After heating, a successful specimen should not exhibit physical damage, exfoliation detachment from the framework, etc.

The fire protection time was measured by subjecting each sample to the fire protection test twice wherein each surface was faced to a heating source. The time was measured until

5,462,805

7

spontaneous inflammation was caused to occur at the non-heated side of the sample or until the through hole allowing passage of flame or smoke was formed. A shorter one was selected for indication.

The impact resistance was examined in accordance with a shot bag test carried out in the following manner. Each sample was vertically fixed. In order to give an impact, a shot bag was made to collide with one surface of the sample with a gradual increase of a falling level. A maximum falling level H was determined at which no through hole was formed in the sample after reception of the impact and a total weight of a dropping part of the glass plate was not greater than 50 g. It is understood that the impact resistance is excellent when the falling level H is high.

The warp was measured by vertically arranging each sample and horizontally putting a straight ruler therealong. Indication is made at a percentage with respect to a horizontal length.

Although the above-mentioned embodiment is directed to the fire-protection and safety glass panel comprising the first and the second glass plates, this invention is not restricted thereto but is also applicable to a fire-protection and safety glass panel comprising three or more glass plates and two or more intermediate resin layers. In this case, each intermediate resin layer is disposed between adjacent ones of the glass plates.

As described above, the fire-protection and safety glass according to this invention has a transparent appearance and has dual functions as a fire-protection glass for shutting out flame and smoke during a long period of time upon occurrence of fire and as a safety glass which is neither shattered into pieces nor forms any through hole if it is broken in an ordinary life.

Turning to FIG. 2, a glass window comprises a fire-protection and safety glass panel 51 and a sash 52 for the fire-protection and safety glass panel 51. As the fire-protection and safety glass panel 51, the fire-protection and safety glass panel described in conjunction with FIG. 1 is used so that the window is a fire-protection and safety glass window.

Turning to FIG. 3, a glass door comprises a fire-protection and safety glass panel 61 and a frame 62 for the fire-protection and safety glass panel 61. The fire-protection and safety glass panel of FIG. 1 is used as the fire-protection and safety glass panel 61 so that the door is a fire-protection and safety glass door. The glass door is installed in an opening 63.

What is claimed is:

1. A fire-protection and safety glass panel comprising a first glass plate, a second glass plate opposite to said first glass plate, and an intermediate resin layer between said first and said second glass plates, at least one of said first and said second glass plates being a low-expansion crystallized glass plate of a low-expansion crystallized glass, wherein said intermediate resin layer comprises a polyethylene terephthalate film, a first adhesive agent layer for adhering said polyethylene terephthalate film to said first glass plate, and a second adhesive agent layer for adhering said polyethylene terephthalate film to said second glass plate, said intermediate resin layer having a thickness which is not greater than 200 μm.

2. A fire-protection and safety glass panel as claimed in claim 1, wherein each of said first and said second adhesive agent layers is of an adhesive agent selected from a group consisting of a silicone adhesive agent and an acrylic adhesive agent.

3. A fire-protection and safety glass panel as claimed in claim 1, wherein each of said first and said second glass

8

plates is a transparent plate, said polyethylene terephthalate film being a transparent film, each of said first and said second adhesive agent layers being a transparent layer.

4. A fire-protection and safety glass panel as claimed in claim 1, wherein said low expansion crystallized glass consists essentially of 3–5 wt % Li₂O, 20–35 wt % Al₂O₃, 55–70 wt % SiO₂, 1–3 wt % TiO₂, 1–4 wt % ZrO₂, 1–5 wt % P₂O₅, 0–4 wt % Na₂O and 0–4 wt % K₂O, where a total amount of Na₂O and K₂O is 0.5–4 wt %, said low-expansion crystallized glass containing β-quartz solid solution crystals.

5. A glass window comprising a fire-protection and safety glass panel and a sash for said fire-protection and safety glass panel, said fire-protection and safety glass panel comprising a first glass plate, a second glass plate opposite to said first glass plate, and an intermediate resin layer between said first and said second glass plates, at least one of said first and said second glass plates being a low-expansion crystallized glass plate of a low-expansion crystallized glass, wherein said intermediate resin layer comprises a polyethylene terephthalate film, a first adhesive agent layer for adhering said polyethylene terephthalate film to said first glass plate, and a second adhesive agent layer for adhering said polyethylene terephthalate film to said second glass plate, said intermediate resin layer having a thickness which is not greater than 200 μm.

6. A glass window as claimed in claim 5, wherein each of said first and said second glass plates is a transparent plate, said polyethylene terephthalate film being a transparent film, each of said first and said second adhesive agent layers being a transparent layer.

7. A glass door comprising a fire-protection and safety glass panel and a frame for said fire-protection and safety glass panel, said fire-protection and safety glass panel comprising a first glass plate, a second glass plate opposite to said first glass plate, and an intermediate resin layer between said first and said second glass plates, at least one of said first and said second glass plates being a low-expansion crystallized glass plate of a low-expansion crystallized glass, wherein said intermediate resin layer comprises a polyethylene terephthalate film, a first adhesive agent layer for adhering said polyethylene terephthalate film to said first plate, and a second adhesive agent layer for adhering said polyethylene terephthalate film to said second glass plate, said intermediate resin layer having a thickness which is not greater than 200 μm.

8. A glass door as claimed in claim 7, wherein each of said first and said second glass plates is a transparent plate, said polyethylene terephthalate film being a transparent film, each of said first and said second adhesive agent layers being a transparent layer.

9. A fire-protection and safety glass panel comprising a plurality of glass plates and an intermediate resin layer between adjacent ones of said plurality of glass plates, at least one of said plurality of glass plates being a low-expansion crystallized glass plate of a low-expansion crystallized glass, wherein said intermediate resin layer comprises a polyethylene terephthalate film, a first adhesive agent layer for adhering said polyethylene terephthalate film to one of said adjacent ones of said plurality of glass plates, and a second adhesive agent layer for adhering said polyethylene terephthalate film to the other of said adjacent ones of said plurality of glass plates, said intermediate resin layer having a thickness which is not greater than 200 μm.

10. A fire-protection and safety glass panel as claimed in claim 9, wherein each of said plurality of glass plates is a transparent plate, said polyethylene terephthalate film being a transparent film, each of said first and said second adhesive

5,462,805

<table>
<tr><td>9</td><td>10</td></tr>
</table>

agent layers being a transparent layer.

**11**. A glass window comprising a fire-protection and safety glass panel and a sash for said fire-protection and safety glass panel, said fire-protection and safety glass panel comprising a plurality of glass plates and an intermediate resin layer between adjacent ones of said plurality of glass plates, at least one of said plurality of glass plates being a low-expansion crystallized glass plate of a low-expansion crystallized glass, wherein said intermediate resin layer comprises a polyethylene terephthalate film, a first adhesive agent layer for adhering said polyethylene terephthalate film to one of said adjacent ones of said plurality of glass plates, and a second adhesive agent layer for adhering said polyethylene terephthalate film to the other of said adjacent ones of said plurality of glass plates, said intermediate resin layer having a thickness which is not greater than 200 μm.

**12**. A glass window as claimed in claim **11**, wherein each of said plurality of glass plates is a transparent plate, said polyethylene terephthalate film being a transparent film, each of said first and said second adhesive agent layers being a transparent layer.

**13**. A glass door comprising a fire-protection and safety glass panel and a frame for said fire-protection and safety glass panel, said fire-protection and safety glass panel comprising a plurality of glass plates and an intermediate resin layer between adjacent ones of said plurality of glass plates, at least one of said plurality of glass plates being a low-expansion crystallized glass plate of a low-expansion crystallized glass, wherein said intermediate resin layer comprises a polyethylene terephthalate film, a first adhesive agent layer for adhering said polyethylene terephthalate film to one of said adjacent ones of said plurality of glass plates, and a second adhesive agent layer for adhering said polyethylene terephthalate film to the other of said adjacent ones of said plurality of glass plates, said intermediate resin layer having a thickness which is not greater than 200 μm.

**14**. A glass door as claimed in claim **13**, wherein each of said plurality of glass plates is a transparent plate, said polyethylene terephthalate film being a transparent film, each of said first and said second adhesive agent layers being a transparent layer.

\*     \*     \*     \*     \*

# ADVOCATES FOR SAFE GLASS



Home    About Us    News    Injury Data    Test Results    Links

**Wired Glass: The Illusion of Safety**

## Wired Glass: The Illusion of Safety

ADVOCATES FOR SAFE GLASS, INC. ("AFSG") is a non-profit organization founded by parents of children severely injured by wired glass products used in buildings. The mission of AFSG is to advocate use of safety glazing in buildings to protect public safety, through adequate building regulations, industry cooperation and public education.

AFSG came about as a result of the discovery by the parents that their children's debilitating injuries were not isolated accidents, but represent a serious national safety problem caused by the use of a dangerous architectural glazing product that gives the illusion of impact safety, but in reality it's anything but safe. Wired glass is a fire protection material, not a safety glazing. The use of wired glass in impact areas has resulted in hundreds, if not thousands, of serious injuries to children and young adults who've suffered amputations, paralysis, permanent nerve damage and loss of mobility.

### The Reality Behind the Illusion

When we began looking a year ago into wired glass use under U.S. buidling codes, we were apalled to find that the CPSC found 25 years ago that wired glass endangers public impact safety, but code regulations to limit its unsafe use have been defeated by an arsenal and abusive tactics.

- Four multi-billion dollar foreign manufacturers, three in Japan, one in the UK, produce the world's supply of wired glass. These companies are among the largest glazing producers in the world, with ownership interests in each other, as well as joint business interests with other large glazing producers operating globally and in the U.S.

- In 1977, the CPSC promulgated the federal safety glazing performance standard, preempting local regulation of safety glazing. Lobbied by foreign wired glass interests for a special exemption because wired glass was the only fire protection glazing available at the time approved as fire door view panels, the CPSC granted a temporary exemption to wired glass used in fire assemblies for a period of 2-1/2 years, to give time to develop technology to make a fire and impact safety glazing.

- The CPSC abandoned its effort to regulate fire-rated wired glass after Japanese manufacturers went to federal court and challenged the temporary period as arbitrary, by deleting the date for terminating the exemption rather than reopening proceedings to develop factual support for the time period.

- The federal exemption left it up to local building codes to regulate fire-rated wired glass used in impact locations, which decided to accept wired glass tested in compliance with a lower, voluntary consensus safety glazing, ANSI Z97.1, developed and reviewed every five years by an industry-based committee.

- The ANSI Z97.1 Review Committee is loaded with foreign wired glass manufacturers, their U.S. distributors and business affiliates, in violation of ANSI procedures.

- The ANSI Z97.1 Committee has voted to retain a lower impact test level, specially to allow wired glass to be classified as a safety product under the ANSI Z97.1 standard, because the CPSC threw out that lower test level as inadequate safety for anyone except children under five.

We discovered that foreign manufacturers have been supplying and passing off inferior wired glass products to the U.S. market that don't meet ANSI Z97.1's lower impact test, while selling to overseas markets a second, stronger "Safety" product with thicker wires certified to UK's equivalent lower standard.

- Wired glass products pulled off the open market here have repeatedly failed lower ANSI Z97.1 impact tests conducted by independent test agencies.

- Wired glass manufacturers have "self-certified" compliance in the U.S. versus required third-party certification in overseas markets.

- Wired glass manufacturers market thinner wire product overseas only as non-safety wired glass.

We are astounded wired glass interests have misrepresented the field safety injury record to building code regulators and the public as no more than a "handful" of reported injuries worldwide in 100 years, when one parent found evidence of fifty injuries within two months.

We are outraged to discover wired glass manufacturers have had technology to make their wired glass products impact safe for a decade, but have concealed that ability from code regulators and the public, and threatened restraint of trade actions.

- Organic safety film products, used by alternative fire-related ceramic glazing manufacturers almost 10 years ago to achieve CPSC impact safety, have been tested successfully with wired glass by non-wired glazing producers.

We were shocked to find those who have stood up against wired glass interests on this safety issue--not only in the U.S., but globally--have been intimidated, harassed, threatened with legal action and more, where reprisal has effectively solenced open opposition.

AFSG has brought this safety issue to the attention of elected officials, public safety organizations, consumer protection agencies, with the goal of obtaining the necessary changes in CPSC regulations and state building codes. We are encouraged by the results achieved by our state elected official and commitment of support by national children's safety and consumer organizations, but regulatory changes take time, months, even years. While changes are pending, children and young adults are at risk every day of serious injury, and the only chance to protect them is to get the word out to the public about the dangers. For that, national media attention is needed to reach the American public with informative information.

# ADVOCATES FOR SAFE GLASS

Home    About Us    News    Injury Data    Test Results    Links

**View:**    **All**    **Articles**    **Trade Publications**    **Code News**    **Letters**

| Title | Date Posted |
| --- | --- |
| Washington Building Codes Invokes Emergency Rule on Wired Glass | July 5, 2005 |
| Protecting People First Foundation Applauds New Legislation | June 17, 2005 |
| Sen. Walker and Advocates Defeat Use of Wired Glass | October 16, 2004 |
| CPSC To Face Congressional Review | May 20, 2004 |
| Wired Glass Industry "No-Show" At CPSC Meeting | May 13, 2004 |
| Shattering the Myth of Wired Glass | May 12, 2004 |
| This Glass Isn't So Safe | April 9, 2004 |
| Accident Changed His Life | April 9, 2004 |
| Glass Facts | November 25, 2003 |
| Tales of the unexpected - the runaway horse | November 25, 2003 |
| The Flames Stop Here | November 25, 2003 |
| Senator Walker Appears Before ICC | October 6, 2003 |
| Wired Glass to be Barred From New Schools Constructed in Oregon | October 6, 2003 |
| Senator Walker Press Release | August 9, 2003 |
| Report from KATU | April 21, 2003 |
| Sen. Walker Issues Letter and Calls for Subpoena | March 23, 2003 |
| Lawmakers consider banning wired glass | March 23, 2003 |
| FOR IMMEDIATE RELEASE | March 23, 2003 |
| KOIN Reports on Lawsuit | November 25, 2002 |
| KOIN Reports on Eugene Injury | November 25, 2002 |
| The Truth Behind the Illusion | November 7, 2002 |
| Standard Wired Glass? "Safety" Wired Glass? | November 7, 2002 |
| ANSI Removes Zaremba | October 18, 2002 |
| Our Article in Consumer Reports | October 14, 2002 |

Is wired glass safe enough?                                October 14, 2002

How Safe Is Safety Glass?                                  May 15, 2002

Consumers And Industry To Pursue Changes In Building Codes  May 12, 2002

AFSG Press Release                                         May 12, 2002

I Am Appalled                                             May 12, 2002

Wired Glass: The Illusion of Safety                        May 12, 2002

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/238,115 | 09/10/2002 | William O'Keeffe | OKEF-07982US1 DBB/SRM | 6410 |

23910        7590        07/15/2005

FLIESLER MEYER, LLP
FOUR EMBARCADERO CENTER
SUITE 400
SAN FRANCISCO, CA  94111

| EXAMINER |
|---|
| CHEN, VIVIAN |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1773 | |

DATE MAILED: 07/15/2005

Please find below and/or attached an Office communication concerning this application or proceeding.

| *Interview Summary* | Application No. | Applicant(s) |
|---|---|---|
| | 10/238,115 | O'KEEFFE, WILLIAM |
| | Examiner | Art Unit | |
| | Vivian Chen | 1773 | |

All participants (applicant, applicant's representative, PTO personnel):

(1) *Vivian Chen, Exr*.                                        (3)*Mr. Myer, Atty*.

(2) *Mr. Borson, Atty*.                                        (4)_____ .

Date of Interview: *12 July 2005*.

Type:  a)☒ Telephonic   b)☐ Video Conference
      c)☐ Personal [copy given to: 1)☐ applicant   2)☐ applicant's representative]

Exhibit shown or demonstration conducted:   d)☐ Yes   e)☒ No.
    If Yes, brief description: _____ .

Claim(s) discussed: *1-32*.

Identification of prior art discussed: *references of record*.

Agreement with respect to the claims f)☐ was reached.   g)☒ was not reached.   h)☐ N/A.

Substance of Interview including description of the general nature of what was agreed to if an agreement was reached, or any other comments: *Mr. Borson discussed possible amendments to claim 1 which would specify that the claimed invention(s) have only a two layer structure (film/glass) and thereby distinguish it from SAKAMOTO '805 and ITOH '839 which require at least three layers (two layers of glazing material and a film layer)*.

(A fuller description, if necessary, and a copy of the amendments which the examiner agreed would render the claims allowable, if available, must be attached.  Also, where no copy of the amendments that would render the claims allowable is available, a summary thereof must be attached.)

THE FORMAL WRITTEN REPLY TO THE LAST OFFICE ACTION MUST INCLUDE THE SUBSTANCE OF THE INTERVIEW. (See MPEP Section 713.04).  If a reply to the last Office action has already been filed, APPLICANT IS GIVEN ONE MONTH FROM THIS INTERVIEW DATE, OR THE MAILING DATE OF THIS INTERVIEW SUMMARY FORM, WHICHEVER IS LATER, TO FILE A STATEMENT OF THE SUBSTANCE OF THE INTERVIEW. See Summary of Record of Interview requirements on reverse side or on attached sheet.

Examiner Note:  You must sign this form unless it is an Attachment to a signed Office action.

_____
Examiner's signature, if required

U.S. Patent and Trademark Office
PTOL-413 (Rev. 04-03)                                Interview Summary                                Paper No. 20050712

## Summary of Record of Interview Requirements

**Manual of Patent Examining Procedure (MPEP), Section 713.04, Substance of Interview Must be Made of Record**
A complete written statement as to the substance of any face-to-face, video conference, or telephone interview with regard to an application must be made of record in the application whether or not an agreement with the examiner was reached at the interview.

**Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews**
**Paragraph (b)**
In every instance where reconsideration is requested in view of an interview with an examiner, a complete written statement of the reasons presented at the interview as warranting favorable action must be filed by the applicant. An interview does not remove the necessity for reply to Office action as specified in §§ 1.111, 1.135. (35 U.S.C. 132)

**37 CFR §1.2 Business to be transacted in writing.**
All business with the Patent or Trademark Office should be transacted in writing. The personal attendance of applicants or their attorneys or agents at the Patent and Trademark Office is unnecessary. The action of the Patent and Trademark Office will be based exclusively on the written record in the Office. No attention will be paid to any alleged oral promise, stipulation, or understanding in relation to which there is disagreement or doubt.

———

The action of the Patent and Trademark Office cannot be based exclusively on the written record in the Office if that record is itself incomplete through the failure to record the substance of interviews.

It is the responsibility of the applicant or the attorney or agent to make the substance of an interview of record in the application file, unless the examiner indicates he or she will do so. It is the examiner's responsibility to see that such a record is made and to correct material inaccuracies which bear directly on the question of patentability.

Examiners must complete an Interview Summary Form for each interview held where a matter of substance has been discussed during the interview by checking the appropriate boxes and filling in the blanks. Discussions regarding only procedural matters, directed solely to restriction requirements for which interview recordation is otherwise provided for in Section 812.01 of the Manual of Patent Examining Procedure, or pointing out typographical errors or unreadable script in Office actions or the like, are excluded from the interview recordation procedures below. Where the substance of an interview is completely recorded in an Examiners Amendment, no separate Interview Summary Record is required.

The Interview Summary Form shall be given an appropriate Paper No., placed in the right hand portion of the file, and listed on the "Contents" section of the file wrapper. In a personal interview, a duplicate of the Form is given to the applicant (or attorney or agent) at the conclusion of the interview. In the case of a telephone or video-conference interview, the copy is mailed to the applicant's correspondence address either with or prior to the next official communication. If additional correspondence from the examiner is not likely before an allowance or if other circumstances dictate, the Form should be mailed promptly after the interview rather than with the next official communication.

The Form provides for recordation of the following information:
–   Application Number (Series Code and Serial Number)
–   Name of applicant
–   Name of examiner
–   Date of interview
–   Type of interview (telephonic, video-conference, or personal)
–   Name of participant(s) (applicant, attorney or agent, examiner, other PTO personnel, etc.)
–   An indication whether or not an exhibit was shown or a demonstration conducted
–   An identification of the specific prior art discussed
–   An indication whether an agreement was reached and if so, a description of the general nature of the agreement (may be by attachment of a copy of amendments or claims agreed as being allowable). Note: Agreement as to allowability is tentative and does not restrict further action by the examiner to the contrary.
–   The signature of the examiner who conducted the interview (if Form is not an attachment to a signed Office action)

It is desirable that the examiner orally remind the applicant of his or her obligation to record the substance of the interview of each case. It should be noted, however, that the Interview Summary Form will not normally be considered a complete and proper recordation of the interview unless it includes, or is supplemented by the applicant or the examiner to include, all of the applicable items required below concerning the substance of the interview.

A complete and proper recordation of the substance of any interview should include at least the following applicable items:
1) A brief description of the nature of any exhibit shown or any demonstration conducted,
2) an identification of the claims discussed,
3) an identification of the specific prior art discussed,
4) an identification of the principal proposed amendments of a substantive nature discussed, unless these are already described on the Interview Summary Form completed by the Examiner,
5) a brief identification of the general thrust of the principal arguments presented to the examiner,
    (The identification of arguments need not be lengthy or elaborate. A verbatim or highly detailed description of the arguments is not required. The identification of the arguments is sufficient if the general nature or thrust of the principal arguments made to the examiner can be understood in the context of the application file. Of course, the applicant may desire to emphasize and fully describe those arguments which he or she feels were or might be persuasive to the examiner.)
6) a general indication of any other pertinent matters discussed, and
7) if appropriate, the general results or outcome of the interview unless already described in the Interview Summary Form completed by the examiner.

Examiners are expected to carefully review the applicant's record of the substance of an interview. If the record is not complete and accurate, the examiner will give the applicant an extendable one month time period to correct the record.

### Examiner to Check for Accuracy

If the claims are allowable for other reasons of record, the examiner should send a letter setting forth the examiner's version of the statement attributed to him or her. If the record is complete and accurate, the examiner should place the indication, "Interview Record OK" on the paper recording the substance of the interview along with the date and the examiner's initials.

2

07/19/2005 13:09 FAX 415 362 2928          FLIESLER MEYER LLP                                    ☒001

# FLIESLER MEYER LLP

INTELLECTUAL PROPERTY LAW

FOUR EMBARCADERO CENTER • FOURTH FLOOR
SAN FRANCISCO • CALIFORNIA 94111-4156
TELEPHONE    415.362.3800
FACSIMILE    415.362.2928
INTERNET     WWW.FDML.COM

**RECEIVED**
CENTRAL FAX CENTER

**JUL 1 9 2005**

TO:            Commissioner for Patents: Art Unit 1773: Examiner Vivian Chen

FAX NO.:       (571) 273 - 8300

FROM:          D. Benjamin Borson, Ph.D., Reg. No: 42,349

RE:            Serial No: 10/238,115

DATE:          July 19, 2005                    Total Pages :    7

Original will follow by mail:  No

If you do not receive all of the pages, please call   Ben Borson   at 415.362.3800.

* Reply to Office Action mailed April 19, 2005
* Certificate of Facsimile Transmission

This facsimile is intended only for the addressee and those authorized by the addressee to receive it. Any use, dissemination, distribution or copying of this facsimile by any others is prohibited. Any others receiving this facsimile are requested to notify FLIESLER MEYER LLP immediately by telephone or fax and to return the original facsimile to FLIESLER MEYER LLP.

07/19/2005 13:10 FAX 415 362 2928    FLIESLER MEYER LLP    @002

RECEIVED

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE CENTRAL FAX CENTER

JUL 1 9 2005

| | |
|---|---|
| In re Application | PATENT APPLICATION |
| Inventor(s):    William O'Keeffe | |
| Appln. No.:     10/238,115 | Art Unit:    1773 |
| Confirm. No.:   6410 | Examiner:   Vivian Chen |
| Filed:           September 10, 2002 | |
| Title:   FIRE RESISTANT SAFETY GLASS | Customer No. 23910 |

CERTIFICATE OF FACSIMILE TRANSMISSION UNDER 37 C.F.R. § 1.8

I hereby certify that this correspondence is being transmitted by facsimile to the Commissioner for Patents, the United States Patent and Trademark Office, Examining Group 1773 Facsimile No. (571) 273-8300, on July 19, 2005. Total number of pages transmitted: 7.

D. Benjamin Borson, Reg. No. 42,349
Signature Date: July 19, 2005

## REPLY TO OFFICE ACTION

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

This REPLY is in response to an Office Action mailed April 19, 2005 and a telephonic interview between the Examiner and the undersigned on July 12, 2005.  Thus, this REPLY is timely filed.

### Amendments

Please amend the above-identified application as follows:

PAGE 2/7 * RCVD AT 7/19/2005 4:06:53 PM [Eastern Daylight Time] * SVR:USPTO-EFXRF-6/24 * DNIS:2738300 * CSID:415 362 2928 * DURATION (mm-ss):01-22

07/19/2005 13:10 FAX 415 362 2928          FLIESLER MEYER LLP                    ☑003

In the Claims:

Please cancel claims 4-7, 9-16, 19-20, 26 and 27. Please amend claims 1, 17 and 24 as indicated. Applicant reserves the right to prosecute the unamended and canceled claims and other claims in Continuing applications.

1.     (Currently amended)  A fire resistant safety glass, ~~comprising~~ consisting essentially of:

       a piece of wire glass; and

       a fire resistant film adhered to said piece of wire glass sufficient to impart an impact resistance of at least about 100 foot lbs.

2.     (Original)     The fire resistant safety glass of claim 1, wherein said fire resistant film is a polymer.

3.     (Original)     The fire resistant safety glass of claim 2, wherein said polymer is PET.

4.     (Canceled)    The fire resistant safety glass of claim 1, further comprising at least one additional piece of fire resistant glazing material.

5.     (Canceled)    The safety glass of claim 4, wherein said fire resistant glazing material is selected from the group consisting of wire glass, annealed glass, tempered glass, fire resistant fiberglass, fire resistant plastics and ceramics.

6.     (Canceled)    A fire resistant safety glass, comprising:

       a piece of wire glass;

       a sheet of fire resistant transparent material separated from said piece of wire glass defining a space therebetween; and

       a fire resistant film sufficient to provide to said fire resistant safety glass an impact resistance of at least about 100 foot lbs.

Attorney Docket No: OKEF 7982 US1 SRM/DBB
dbb/OKEF/7982 US1.023_.wpd                    2

7.    (Canceled)    The fire resistant safety glass of claim 6, wherein said space comprises an insulating fire resistant gel.

8.    (Original)    The fire resistant safety glass of claim 1, further comprising a coloring agent.

9.    (Canceled)    The fire resistant safety glass of claim 6, wherein said glass withstands an impact of about 100 foot lbs to about 4000 foot lbs.

10.    (Canceled)    The fire resistant safety glass of claim 6, wherein said sheet of transparent material is selected from the group consisting of tempered glass, laminated glass, fire resistant plastics and fire resistant fiberglass.

11.    (Canceled)    The fire resistant safety glass of claim 6, wherein said fire resistant film is PET.

12.    (Canceled)    A fire resistant safety glass, comprising:
a pane of wire glass;
at least one other pane of fire resistant glazing material adhered to said pane of wire glass by a fire resistant adhesive; and
at least one layer of fire resistant film sufficient to impart to said fire resistant safety glass, an impact resistance of at least about 100 foot lbs.

13.    (Canceled)    The fire resistant safety glass of claim 12, wherein said fire resistant adhesive is water glass.

14.    (Canceled)    The fire resistant safety glass of claim 12, wherein said fire resistant glazing material is selected from the group consisting of wire glass, annealed glass, tempered glass, fire resistant fiberglass and fire resistant plastics.

3

07/19/2005 13:10 FAX 415 362 2928          FLIESLER MEYER LLP                    ☑005

15.    (Canceled)    The fire resistant safety glass of claim 14, wherein said fire resistant film is PET.

16.    (Canceled)    The fire resistant safety glass of claim 12, wherein said glass withstands an impact in the range of about 100 foot lbs to about 4000 foot lbs.

17.    (Currently amended)    A method of manufacturing a fire resistant safety glass, comprising the steps of:

    providing at ~~least~~ one sheet of wire glass; and

    adhering a fire resistant film to said sheet of wire glass sufficient to impart to said fire resistant safety glass an impact resistance of about 100 foot lbs to about 4000 foot lbs.

18.    (Original)    The method of claim 17, wherein said fire resistant film is PET.

19.    (Canceled)    The method of claim 17, further comprising the step of adhering one or more sheets of fire resistant glazing material to said sheet of wire glass.

20.    (Canceled)    The method of claim 19, wherein said fire resistant glazing material is selected from the group consisting of wire glass, annealed glass, tempered glass, fire resistant fiberglass and fire resistant plastics.

21.    (Original)    The fire resistant safety wire glass of claim 1, wherein said fire resistant film is a reflective film.

22.    (Original)    The fire resistant safety wire glass of claim 1, wherein said fire resistant film comprises a metal.

23.    (Original)    The fire resistant safety wire glass of claim 21, wherein said metal comprises

PAGE 5/7 * RCVD AT 7/19/2005 4:06:53 PM [Eastern Daylight Time] * SVR:USPTO-EFXRF-6/24 * DNIS:2738300 * CSID:415 362 2928 * DURATION (mm-ss):01-22

07/19/2005 13:10 FAX 415 362 2928     FLIESLER MEYER LLP      ☒006

stainless steel or lead.

24.     (Currently amended)   A fire resistant safety glass, ~~comprising~~ <u>consisting essentially of</u>:

a piece of wire glass; and

a piece of fire resistant glazing adhered thereto said fire resistant safety glass having an impact resistance of between about 100 foot lbs and about 4000 foot lbs.

25.     (Original)     The fire resistant safety glass of claim 24, wherein said fire resistant glazing is selected from the group consisting of tempered glass, annealed glass, wire glass, fire resistant fiberglass, fire resistant plastics and ceramics.

26.     (Canceled)     The fire resistant safety glass of claim 24, further comprising an insulating space between said piece of wire glass and said piece of fire resistant glazing.

27.     (Canceled)     The fire resistant safety glass of claim 26, wherein said insulating space comprises a fire resistant material.

PAGE 6/7 * RCVD AT 7/19/2005 4:06:53 PM [Eastern Daylight Time] * SVR:USPTO-EFXRF-6/24 * DNIS:2738300 * CSID:415 362 2928 * DURATION (mm-ss):01-22

07/19/2005 13:10 FAX 415 362 2928        FLIESLER MEYER LLP        ☑007

### Remarks

The above Amendments and these Remarks are in reply to an Office Action mailed April 19, 2005 and to a telephonic interview between the Examiner and the undersigned on July 12, 2005. The claims were rejected under 35 U.S.C. §103(a) as obvious.

Applicants have amended the remaining independent claims to include "consisting essentially of" as the connecting phrase. The Examiner indicated that this amendment could overcome the rejection under 35 U.S.C. §103(a) over Sakamoto, which discloses at least two glass plates. Further, Sakamoto does not disclose the recited impact resistance.

Applicant incorporates all prior remarks herein fully by reference and reiterates them herein.

Applicant respectfully submits that the instant claims are allowable at least because elimination of structures considered to be necessary by Sakamoto while retaining their function is indicative of nonobviousness.

In view of the above remarks, Applicant submits that all of the claims currently pending are patentable and request reconsideration of the rejections and further requests the issuance of a Notice of Allowance.

The Commissioner is authorized to charge any underpayment or credit any overpayment to Deposit Account No. 06-1325 for any matter in connection with this response, including any fee for extension of time, which may be required.

Respectfully submitted,

Date:        July 19, 2005        By:        _D. Benjamin Borson_

D. Benjamin Borson, Ph.D.
Reg. No. 42,349

Customer No. 23910
FLIESLER MEYER LLP
Four Embarcadero Center, Fourth Floor
San Francisco, California 94111-4156
Telephone: (415) 362-3800

Attorney Docket No: OKEF 7982 US1 SRM/DBB
dbb/OKEF/7982 US1.010.Reply Dec 28 2004.wpd        6

# PATENT APPLICATION FEE DETERMINATION RECORD
### Effective October 1, 2001

Application or Docket Number

10 38115

## CLAIMS AS FILED - PART I

| | (Column 1) | (Column 2) |
|---|---|---|
| TOTAL CLAIMS | 22 | |
| FOR | NUMBER FILED | NUMBER EXTRA |
| TOTAL CHARGEABLE CLAIMS | 27 minus 20 = | 7 |
| INDEPENDENT CLAIMS | 26 minus 3 = | 22 |
| MULTIPLE DEPENDENT CLAIM PRESENT | | ☐ |

\* If the difference in column 1 is less than zero, enter "0" in column 2

| SMALL ENTITY TYPE ☐ | | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|
| RATE | FEE | OR | RATE | FEE |
| BASIC FEE | 370.00 | OR | BASIC FEE | 740.00 |
| X$ 9= | 63 | OR | X$18= | |
| X42= | 126 | OR | X84= | |
| +140= | | OR | +280= | |
| TOTAL | 559 | OR | TOTAL | |

## CLAIMS AS AMENDED - PART II

01/13/05

### AMENDMENT A

| | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA |
|---|---|---|---|---|
| Total | 32 | Minus | 27 | 5 |
| Independent | 6 | Minus | 5 | 1 |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | ☐ |

| SMALL ENTITY | | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|
| RATE | ADDI- TIONAL FEE | | RATE | ADDI- TIONAL FEE |
| X$ 9= | | OR | X$18= | |
| X42= | | OR | X84= | |
| +140= | | OR | +280= | |
| TOTAL ADDIT. FEE | | | TOTAL ADDIT. FEE | |

Paul

7/9/05

### AMENDMENT B

| | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA |
|---|---|---|---|---|
| Total | 10 | Minus | 32 | 0 |
| Independent | 3 | Minus | 6 | 0 |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | ☐ |

| RATE | ADDI- TIONAL FEE | | RATE | ADDI- TIONAL FEE |
|---|---|---|---|---|
| X$ 9= | | OR | X$18= | |
| X42= | | OR | X84= | |
| +140= | | OR | +280= | |
| TOTAL ADDIT. FEE | | | TOTAL ADDIT. FEE | |

### AMENDMENT C

| | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA |
|---|---|---|---|---|
| Total | | Minus | | |
| Independent | | Minus | | |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | ☐ |

| RATE | ADDI- TIONAL FEE | | RATE | ADDI- TIONAL FEE |
|---|---|---|---|---|
| X$ 9= | | OR | X$18= | |
| X42= | | OR | X84= | |
| +140= | | OR | +280= | |
| TOTAL ADDIT. FEE | | | TOTAL ADDIT. FEE | |

\* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
\*\* If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20."
\*\*\* If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3."
   The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

FORM PTO-875  (Rev. 8/01)          ☆U.S. GPO:2001 483-134 / SN 93     Patent and Trademark Office, U.S. DEPARTMENT OF COMMERCE

BEST AVAILABLE COPY