## AFFIDAVIT OF CARL KERNANDER

I, Carl Kernander, under penalty of perjury hereby depose and say:

1.  I am over eighteen years of age and am competent to testify as to the matters set forth herein.

2.  I am the Technical Service Manager and Technical Manager for Safety and Security Products for Madico, Inc., ("Madico"), a well-known manufacturer of window films including PET-based safety and security window films marketed and sold under the name "Protekt." I have held these positions since 2003. From 1997 - 2003, I held the position of Senior Development Chemist for Madico, in which I developed new film products including safety and security window films.

3.  My general responsibilities as Technical Service Manager and Technical Manager for Safety and Security Products are to address technical issues between customers and Madico's sales department, address warranty issues, provide oversight for Madico's research and development team, develop marketing materials, and coordinate all safety testing of Madico's window film products.

4.  Prior to joining Madico, I was a Senior Research Scientist for Polyclad Laminates, in which I designed laminates for printed circuit boards.

5.  As part of my responsibilities with Madico, I am familiar with Madico's products, product testing and marketing materials. I am also familiar with the impact performance specifications set forth in ANSI Z97.1 and its British equivalent BS6206.

6.  To the best of my knowledge, the documents listed below and attached hereto, which I have reviewed, are true and accurate copies of documents made in the ordinary course of Madico's business. These documents are as follows:

    a.  A 1995 Material Safety Data Sheet ("1995 Protekt MSDS"), attached as Exhibit A, listing multiple PET-containing Madico films including the CL-400-XSR film;
    b.  A Madico marketing brochure titled "CL-400-XSR Madico Protekt Film" (the "Brochure") attached as Exhibit B; and
    c.  Test results from the British Standards Institution ("BSi") of Madico's CL-400-XSR film on annealed and wired glass dated February 4, 1998, attached as Exhibit C, (the "BSi Results" or "BSi Tests").

7.    To the best of my knowledge, the BSi Results are the results referred to in a November 1998 Glass Age and Window Construction Article titled "Thin glazing can be made safe," attached hereto as Exhibit D. Indeed, as of 1998, the BSi Tests were the only tests of Madico films on wired glass to assess compliance with British standards.

8.    To the best of my knowledge, it is a general practice of Madico to distribute MSDS information to the public in the same year for which the MSDS is dated, and this practice was follow by Madico in 1995. As such, it is my understanding that the 1995 Protekt MSDS was distributed to the public in the United States early as 1995. Likewise, it is my understanding that the Brochure and BSi Results were and are available to the public in the U.S.

9.    The Madico "Protekt" CL-400-XSR film used in the BSi Tests was a PET-containing film as indicated on the 1995 Protekt MSDS. Moreover, to the best of my knowledge, there was no change in composition of the CL-400-XSR film between 1995 and 1998.

10.    To my knowledge Madico's CL-400-XSR film has always been marketed and sold under the trade name "Protekt" including at the time of the BSi Tests in 1998. Moreover, "Protekt" films have been publicly available since at least February 1978 and, in 1998, all Madico "Protekt" films contained PET.

11.    It is my understanding that during the BSi Tests, BSi tested single pieces of wired glass with Protekt CL-400-XSR film applied to one side of the glass for compliance with BS6206:1981.

12.    It is my understanding that BS6206:1981 is the British equivalent of the U.S. standard ANSI Z97.1 titled "Safety performance specifications and methods of test for safety glazing material used in buildings." More specifically, it is my understanding that BS6206:1981 Class B is a class of safety glass that does not break when a 45 kg (100 lb) impactor is dropped from a height of 305 mm (12 in) and 457 mm (18 in) or breaks safely as defined in section 5.3 of BS6206:1981. These test criteria correspond to criteria set forth in the ANSI Z97.1 standard. Significantly, the wired glass with the PET containing Protekt film tested in the BSi Tests met the Class B criteria and therefore had an impact resistance of at least about 150 ft lbs, i.e., impact of a 100 lb bag of lead shot from a distance of 1.5 ft (18 in) = 150 ft/lbs of impact resistance. A copy of BS6206:1981 is attached as Exhibit E.

13.    It is also my understanding that it is common knowledge in the window film industry that PET-based films are the only films with sufficient optical clarity

for use on windows and that, to my knowledge, all after market window safety films include PET.

14.    To the best of my knowledge, the Protekt CL-400-XSR window film is a fire resistant film when mounted on glass and has been independently tested to verify its fire resistance.

SIGNED UNDER THE PENALTIES OF PERJURY THIS _8th_ DAY OF OCTOBER, 2007.

_____

Carl Kernander

STATE OF MASSACHUSETTS    )
                          )
                          ) ss:
                          )
COUNTY OF MIDDLESEX        )

On this _8th_ day of _October_, 2007, before me, the undersigned notary public, personally appeared, _CARL KERNANDER_, proved to me through satisfactory evidence of identification, to be the person whose name is signed on the preceding or attached document in my presence.

_____

Notary Public                [SEAL]
My Commission Expires: _Dec. 4, 2009_

# United States Patent [19]

## Leotta

[11] **Patent Number:** **5,049,433**

[45] **Date of Patent:** **Sep. 17, 1991**

[54] **ARCHITECTURAL SAFETY GLASS**

[75] Inventor: **Frank R. Leotta**, Nutley, N.J.

[73] Assignee: **The Answer Corp.**, New Hyde Park, N.Y.

[21] Appl. No.: **525,199**

[22] Filed: **May 17, 1990**

[51] Int. Cl.⁵ ............................................... **B32B 9/00**

Int. Cl.$^5$ ............................................... **B32B 9/00**

[52] U.S. Cl. ................................... **428/195**; 428/411.1; 428/426; 428/15; 428/40

[58] Field of Search ...................... 428/195, 411.1, 426, 428/15, 40

[56]                  **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,039,720 | 8/1977 | Cherenko et al. | 428/409 |
| 3,629,044 | 12/1971 | Sanger | 161/5 |
| 3,922,456 | 11/1975 | Baldridge | 428/38 |
| 4,035,549 | 7/1977 | Kennar | 428/409 |
| 4,173,672 | 11/1979 | Mannheim | 428/38 |
| 4,200,681 | 4/1980 | Hall et al. | 428/412 |
| 4,230,769 | 10/1980 | Goossens | 428/412 |
| 4,248,918 | 2/1981 | Hornibrook et al. | 428/40 |
| 4,341,683 | 7/1982 | Snelgrove | 428/437 |
| 4,663,228 | 5/1987 | Bolton et al. | 428/411.1 |
| 4,946,827 | 8/1990 | Harrison et al. | 428/195 |

*Primary Examiner*—Patrick J. Ryan
*Assistant Examiner*—Elizabeth Evans
*Attorney, Agent, or Firm*—Bernard Malina

[57]                  **ABSTRACT**

An architectural safety glass laminate is provided having a glass sheet, a plastic substrate, and therebetween an adhesive film. The substrate is provided with a decorative pattern on one surface thereof. An acrylic based substance is employed as the adhesive.

**10 Claims, 1 Drawing Sheet**



**U.S. Patent**          Sep. 17, 1991          **5,049,433**

FIG. 1



FIG. 2



FIRST PASS — ADHESIVE TO GLASS



SECOND PASS— PLASTIC TO ADHESIVE / GLASS

5,049,433

1

# ARCHITECTURAL SAFETY GLASS

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The invention concerns an architectural safety glass laminate provided with a decorative pattern.

### 2. The Related Art

A laminated glass has long been employed in both the automotive and construction industries. These laminates have generally been transparent for use as windshields or windows.

U.S. Pat. No. 4,200,681 (Hall et al) discloses a non-opaque polycarbonate article having improved mar, abrasion, scratch and solvent resistance. The article is formed from a polycarbonate substrate having deposited thereon an intermediate layer of photoreacted products derived of certain polyfunctional acrylic monomers. Onto the intermediate layer is vapor deposited a film of glass.

U.S. Pat. No. 4,230,769 (Goosens) reports a glass-polycarbonate resin laminate. Therein a glass layer is bonded to a polycarbonate resin layer by means of a three layered adhesive system involving different polyalkoxysilanes.

A further disclosure of reinforced glass structures is presented in U.S. Pat. No. 4,663,228 (Bolton et al). This patent teaches laminates formed of glass, ionomer resin and a polycarbonate sheet. The ionomer resin is described as an extrudable or cast substance comprising ionically cross-linked ethylene-methacrylic acid co-polymers such as that available under the trademark "Surlyn" from the DuPont Company.

A number of patents describe safety glass structures provided with imprintations. Illustrative is U.S. Pat. No. 4,035,549 (Kennar) wherein glass is juxtaposed against a printed polyvinyl butyral (PVB) or a polyure-thane layer. A technique is revealed in U.S. Pat. No. 4,341,683 (Snelgrove) for printing onto PVB sheets. See also U.S. Pat. No. 3,922,456 (Baldridge). In U.S. Pat. No. 4,173,672 (Mannheim), a laminate is decorated through thermo-impression and fixation of a PVB layer between two glass sheets.

In commerce there are available laminated glasses that have been provided with color. To secure color into the glass, an oven firing feature has usually been required. This procedure is expensive and only achieves solid colors. Attractive patterns such as marbling have heretofore not readily been achievable.

From the aforementioned patent art some progress has been made in providing decorative patterns but there still remains considerable room for improvement. Among problems found in the art is that printing interferes with adhesion of adjacent layers and the occurrence of bubble formations leading to delamination.

Accordingly, an object of the present invention is to provide an architectural sheet of shatterproof glass.

A further object of the present invention is to provide an architectural sheet of shatterproof glass imprinted with a decorative pattern.

A still further object of the present invention is to provide a laminated sheet of shatterproof glass whose layers are resistant to delamination even when imprinted with a decorative pattern.

2

## SUMMARY OF THE INVENTION

An architectural safety glass laminate is provided comprising:

(i) a glass sheet;

(ii) an adhesive film; and

(iii) a plastic substrate provided with a decorative pattern on one surface thereof, the adhesive film positioned between and bonding the glass sheet to the plastic substrate.

Advantageously, the adhesive film is formed from an acrylic substance, especially an acrylic adhesive in the form of a double-sided tape or a liquid. Among the preferred plastic substrates are polyvinyl chloride (PVC), polycarbonate (PC), and polyethylene tere-phthalate (PET). Screen printing is the preferred method of providing the substrate with the decorative pattern.

## BRIEF DESCRIPTION OF THE DRAWING

The above and other objects, features and advantages of the invention will become more readily apparent from the following description, reference being made to the drawing which includes:

FIG. 1 which is a cross-section through the laminate; and

FIG. 2 which is a highly schematic rendering of the production process.

## DETAILED DESCRIPTION

Now it has been found that delamination resistant decorative safety glass for architectural purposes can be obtained through a very simple construction. Specifically, the laminate of the present invention will comprise a glass sheet and a plastic substrate provided with a decorative pattern on one surface of the substrate. Critical to the invention is the use of a special adhesive which is an acrylic substance. This substance is most easily utilized when in the form of a double-sided tape. A particularly useful adhesive of the aforementioned type is available from the 3M Company sold under the designation No. 9473. A liquid acrylic adhesive may also be useful.

Plastic substrates suitable for the present invention include polyvinyl chloride (PVC) and the engineering thermoplastics generically known as polycarbonate and polyethylene terephthalate (PET). Polycarbonate is available from the General Electric Company under the trademark Lexan. Polyethylene terephthalate is available from the DuPont Company under the trademark Mylar.

Arrangement of the three layers according to the invention will best be understood by reference to FIG. 1. Therein is illustrated a glass sheet 1 as the top layer of the laminate. On an opposite outer side of the laminate is a plastic substrate 3. Between the glass sheet and plastic substrate is an adhesive film 2 bonding the glass to the plastic substrate. Glass sheet 1 is the sole glass sheet of the laminate, i.e. a single glass laminate article.

Thickness of the glass sheet may range from about 1 inch to about 1/32 inch, preferably $\frac{1}{8}$ to 1/16 inch, optimally about $\frac{1}{8}$ inch. The plastic substrate is applied in thicknesses ranging from about 100 mil to about 1 mil, preferably from 50 mil to 5 mil, optimally from 25 mil to 10 mil. The adhesive film is applied in thicknesses ranging from about 100 mil to about 1 mil, preferably from 20 mil to 2 mil, optimally from 10 mil to 5 mil.

5,049,433

3

The decorative pattern, preferably a marbleized pattern, can be applied to the plastic substrate by screen printing.

Screen printing involves forcing ink through a stencil. The stencil is a screen having porous portions that allow passage of ink to flow through onto the substrate reproducing a desired image. A squeegee normally formed from a flexible material such as urethane is used to force the ink through the screen.

Screen printing originally was known as silk screen printing but over the years other supporting materials for the stencil image have replaced silk. Most commercial screen printing now is accomplished with stainless steel mesh that has openings much finer than those possible with silk or other textiles, and stencils now are formed by photographic processes.

There are three types of screen printing presses in use today: manual, semi-automatic, and automatic. All of them contain the basic elements of a stencil or screen, a squeegee, and some type of back-up plate or fixture to hold the substrate in place.

The manual press consists of a table having a hinged frame which contains the printing screen. The substrate to be printed is held below on the back-up plate while ink is applied manually by means of a hand squeegee. Both frame and substrate are held stationary in this method.

Semi-automatic presses can be of the flat-bed type as just described or of the cylinder type. Simple, flat-bed type presses differ from the manual ones in that the squeegee is mechanized. In the cylinder press, the substrate is passed under the screen by means of a rotating cylinder which is usually vacuumized to hold the substrate in place. In the case of printing on cylindrical objects, the cylinder may be replaced by the substrate itself which will be rotated beneath the screen.

The automatic machine works on exactly the same principle as the semi-automatic machines, except that the former does not stop after a substrate has been printed. The squeegee moves continuously, or in the case of a stationary squeegee the screen moves continuously.

Within the context of the present invention, transfer means other than screen printing can be utilized, although less advantageously. Alternate transfer means include the techniques of letterpress, gravure (also called rotogravure), flexography, jet printing, pad transfer printing, and web printing. Brief descriptions of these alternate techniques may be found in *Modern Plastics Encyclopedia*, Volume 65, No. 11, mid-October 1989 issue, pages 382–383, herein incorporated by reference.

Screen printing operates through the transfer of one color at a time per pass through the system. Normally anywhere from 1 to 12 colors are employed in any particular design, thereby necessitating an equivalent number of screen plates.

The industry accepted method for transferring a design begins first with the printing of background colors, then the pattern (color within an image outline), and finally the outline itself.

FIG. 2 illustrates one method of producing the single glass laminates of the present invention. A sheet hardened, tempered or chemically hardened glass 6 is transported along a conveyor system 8. A double-sided adhesive tape 10 carrying an adhesive film 12 having a release paper 14 attached thereto is unwound from supply roll 16. The adhesive tape 10 is led around an

4

idle roll 18 and thereafter heated in a vicinity of heater 20. Heated adhesive film 12 is then directed onto the transported glass sheet 6. A pair of nip rolls 22a and 22b firmly press against release paper 14 to firmly secure adhesive film 12 against glass sheet 6.

The same equipment that laminates adhesive to glass may be employed to laminate plastic substrate to the adhesive film/glass composite Thus, a roll of plastic substrate 24 may be charged onto supply roll 16 and unfurled around idle roll 18 and fed onto the release paper removed composite of adhesive film/glass. Nip rolls 22a and 22b again provide final pressure to compress together all three layers of the laminate.

For purposes of high speed and continuous operation, it may be desirable to avoid recycling the adhesive film/glass on the same equipment to achieve bonding of the plastic substrates. Consequently, it may be desirable to have downstream from the first lamination system separate supply roll, idle roll and nip roll equipment dedicated solely to laminating the plastic substrate onto the first two layers.

The following examples will more fully illustrate the invention and selected embodiments thereof.

EXAMPLE

A ¼ inch tempered Spandrel ® glass was fed through the conveyor-roll system illustrated in FIG. 2. Onto the glass was directed a double-face tape from the 3M Company identified as No. 9473 of 10 mil thickness. To ensure good adhesion, the combined adhesive film/-glass was pressed between a pair of nip rolls. Release paper was then removed to expose a second side of the adhesive tape. A sheet of PVC obtained from Huls of America of 10 mil thickness was then applied to the exposed second adhesive side of the adhesive/glass combination. Prior to this lamination, the PVC substrate was provided with a white background and then screen printed with a black ink to achieve a marble effect.

The resultant single glass laminate was compressed by passing through a set of nip rolls. The product had a very satisfactory integrity and did not delaminate.

The foregoing drawing and description illustrates selected embodiments of the present invention. In light thereof, various modifications will be suggested to one skilled in the art, all of which are within the spirit and purview of this invention.

What is claimed is:

1. An architectural safety glass laminate comprising:
(i) a glass sheet;
(ii) an adhesive film which is an acrylic substance; and
(iii) a plastic substrate provided with a decorative pattern on one surface thereof, said adhesive film positioned between and bonding said glass sheet to said surface of said plastic substrate.

2. The laminate of claim 1, wherein said laminate is manufactured with said adhesive film in the form of a double-sided tape.

3. The laminate of claim 1, wherein said pattern is supplied by ink through a process of screen printing.

4. The laminate of claim 1, wherein said pattern is a marble pattern.

5. The laminate of claim 1, wherein said plastic substrate is selected from the group consisting of polyvinyl chloride, polycarbonate and polyethylene terephthalate.

6. The laminate of claim 1, wherein said glass has a thickness ranging from about 1 inch to about 1/32 inch.

5,049,433

5

**7**. The laminate of claim **1**, wherein said glass has a thickness ranging from about ½ inch to about 1/16 inch.

**8**. The laminate of claim **1**, wherein said adhesive film has a thickness ranging from about 20 mil to about 2 mil.

**9**. The laminate of claim **1**, wherein said plastic sub-

6

strate has a thickness ranging from about 100 mill to about 1 mil.

**10**. The laminate of claim **1**, wherein said plastic substrate has a thickness ranging from about 25 mil to about 10 mil.

* * * * *

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/238,115 | 09/10/2002 | William O'Keeffe | OKEF-07982US1 DBB/SRM | 6410 |

23910      7590      04/19/2005

FLIESLER MEYER, LLP
FOUR EMBARCADERO CENTER
SUITE 400
SAN FRANCISCO, CA 94111

| EXAMINER |
|---|
| CHEN, VIVIAN |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1773 | |

DATE MAILED: 04/19/2005

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

| **Office Action Summary** | Application No. | Applicant(s) |
| | 10/238,115 | O'KEEFFE, WILLIAM |
| | Examiner | Art Unit | |
| | Vivian Chen | 1773 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

## Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE **3** MONTH(S) FROM
THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If the period for reply specified above is less than thirty (30) days, a reply within the statutory minimum of thirty (30) days will be considered timely.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

## Status

1)☒ Responsive to communication(s) filed on <u>01 February 2005</u>.                                              .

2a)☐ This action is **FINAL**.        2b)☒ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is
closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

## Disposition of Claims

4)☒ Claim(s) <u>1-27</u> is/are pending in the application.

    4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) <u>1-27</u> is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

## Application Papers

9)☐ The specification is objected to by the Examiner.

10)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

## Priority under 35 U.S.C. § 119

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All  b)☐ Some * c)☐ None of:

      1. ☐ Certified copies of the priority documents have been received.

      2. ☐ Certified copies of the priority documents have been received in Application No. _____.

      3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage
application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

## Attachment(s)

1) ☐ Notice of References Cited (PTO-892)
2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3) ☐ Information Disclosure Statement(s) (PTO-1449 or PTO/SB/08) Paper No(s)/Mail Date _____.

4) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____ .
5) ☐ Notice of Informal Patent Application (PTO-152)
6) ☐ Other: _____.

Application/Control Number: 10/238,115                                    Page 2

Art Unit: 1773

**DETAILED ACTION**

*Claim Rejections - 35 USC § 103*

1.      Claims 1-5, 8, 12-25 are rejected under 35 U.S.C. 103(a) as being unpatentable over

SAKAMOTO ET AL (US 5,462,805) in view of Applicant's admissions and KOLLAJA ET AL

(US 6,613,411).

SAKAMOTO ET AL '805 discloses an impact resistant fire protection safety glass

comprising a first glass plate, a polymeric interlayer comprising a PET film, and a second glass

plate, wherein the glass plates are heat-resistant glass such as wire glass, (lines 24-30, col. 2; line

46, col. 4 to line 3, col. 5; lines 19-26, col. 7).  However, the reference does not explicitly

disclose the recited impact resistance.

Applicant admits that current minimum safety glazing standards require an impact

resistance of at least 100 ft-lbs (Applicant's Specification, page 1, paragraph 0008).

KOLLAJA ET AL discloses that it is well known in the art to use flame retardants to

increase the fire resistance of polyester-based films (lines 25-37, col. 8).

It would have been obvious to a person of ordinary skill in the art at the time the

invention was made to select the thickness and mechanical properties of the polymeric interlayer

in order to obtain sufficient impact resistance to meet or exceed established safety standards

(claims 1, 9, 12, 16, 17, 24).  It would have also been obvious to use conventional additives such

as flame retardants in order to increase the fire resistance of the polyester films.  It would have

been obvious to apply a known heat-reflective layer such as metal to a fire resistant glazing film

in order to minimize heat transmission through the glazing structures (claims 22-23).  One of

Application/Control Number: 10/238,115                                    Page 3
Art Unit: 1773

ordinary skill in the art would have used known fire resistant adhesives (claim 13) to adhere

functional films to the glazing structures and to bond elements of laminated glass together.


2.      Claims 1-27 are rejected under 35 U.S.C. 103(a) as being unpatentable over ITOH ET

AL (US 5,653,839) in view of SAKAMOTO ET AL (US 5,462,805) and Applicant's admissions

and KOLLAJA ET AL (US 6,613,411).

        ITOH ET AL discloses fire resistant glazing structures comprising at least two plate

components separated by a space, wherein the space is filled with a fire-resistant gel, and

wherein each plate component may individually comprise wire glass, laminate glass, colored

glass, tempered and other heat-treated glasses, glasses having heat-reflective films thereon, and

combinations thereof. (lines 15-50, col. 7). However, the reference does not explicitly disclose

the recited impact resistance or the use of polyester films.

        SAKAMOTO ET AL '805 discloses that it is well known in the art to form composite

glazing materials by combining wire glass with a polymeric interlayer comprising a PET film

with to obtain impact resistant fire-protection panels and articles (lines 24-30, col. 2; line 46, col.

4 to line 3, col. 5; lines 19-26, col. 7).

        Applicant admits that current minimum safety glazing standards require an impact

resistance of at least 100 ft-lbs (Applicant's Specification, page 1, paragraph 0008).

        KOLLAJA ET AL discloses that it is well known in the art to use flame retardants to

increase the fire resistance of polyester-based films (lines 25-37, col. 8).

        It would have been obvious to a person of ordinary skill in the art at the time the

invention was made to utilize known impact resistant fire-blocking glazing sheet materials as

Application/Control Number: 10/238,115                                    Page 4
Art Unit: 1773

disclosed in SAKAMOTO ET AL '805 as the plate components in ITOH ET AL in order to form

fire resistant glazing structures with improved impact resistance.  It also would have been

obvious to select the thickness and mechanical properties of the polymeric interlayer in order to

obtain sufficient impact resistance to meet or exceed established safety standards (claims 1, 9,

12, 16, 17, 24).  One of ordinary skill in the art would have used conventional additives such as

flame retardants in order to increase the fire resistance of the polyester films.  It would have been

obvious to apply a known heat-reflective layer such as metal to a fire resistant glazing film in

order to minimize heat transmission through glazing structures (claims 22-23).  One of ordinary

skill in the art would have used known fire resistant adhesives (claim 13) to adhere functional

films to the glazing structures and to bond elements of laminated glass together.


3.      Claims 22-23 are rejected under 35 U.S.C. 103(a) as being unpatentable over:

        (a) SAKAMOTO ET AL (US 5,462,805) in view of Applicant's admissions and

KOLLAJA ET AL (US 6,613,411); or

        (b) ITOH ET AL (US 5,653,839) in view of SAKAMOTO ET AL (US 5,462,805) and

Applicant's admissions and KOLLAJA ET AL (US 6,613,411);

        as applied to claim 1 above,

        and further in view of FARMER ET AL (US 4,973,511).

        FARMER ET AL discloses that it is well known in the art to apply thin metal coatings

comprising stainless steel or other metals to polyester films for use in safety glazing applications

in order to minimize heat transmission through the glazing (lines 45-60, col. 2; lines 64-66, col.

3; lines 30-35, col. 5)

Application/Control Number: 10/238,115                                    Page 5
Art Unit: 1773

It would have been obvious to one of ordinary skill in the art at the time the invention

was made to apply a known heat-reflective layer such as metal to a fire resistant glazing film in

order to minimize heat transmission through glazing structures (claims 22-23).


### Response to Arguments

4.      Applicant's arguments filed 2/1/2005 have been fully considered but they are not

persuasive.

(A)  Applicant argues that the prior art of record fails to disclose the recited impact

resistance.  However, Applicant admits that current minimum safety glazing standards require an

impact resistance of 100 ft-lbs (Applicant's Specification, page 1, paragraph 0008).  It is the

Examiner's position that it would have been obvious to one of ordinary skill in the art to select

the thickness and mechanical properties of the components utilized in composite glazing

structures in order to obtain sufficient impact resistance to meet or exceed established safety

standards in order to facilitate compliance with safety and construction codes.

(B)  Applicant argues that SAKAMOTO ET AL teaches away from the claimed

invention because the examples in the reference fails to explicitly disclose laminates with the

recited impact resistance.  However, the teaching in a reference is not limited solely to the

reference's examples.  While SAKAMOTO's method for testing impact resistance differ from

the Applicant's method, Applicant has not provided any probative evidence to indicate that the

laminates of SAKAMOTO are wholly incapable of achieving  the recited minimum impact

resistance values with suitable material selection, especially in view of Applicant's admission

that an impact resistance of 100 ft-lbs or greater is a known safety standard.

(C) Applicant argues that KOLLAJA fails to teach the claimed invention in its entirety, especially the recited impact resistance.  In response to applicant's arguments against the reference individually, one cannot show nonobviousness by attacking references individually where the rejections are based on combinations of references.  See *In re Keller*, 642 F.2d 413, 208 USPQ 871 (CCPA 1981); *In re Merck & Co.,* 800 F.2d 1091, 231 USPQ 375 (Fed. Cir. 1986).  KOLLAJA is relied upon to illustrate that it is well known in the art to use known additives in order to make polyester films fire resistant.

(D) Applicant argues that ITOH fails to teach the claimed invention in its entirety, especially the recited impact resistance.  In response to applicant's arguments against the reference individually, one cannot show nonobviousness by attacking references individually where the rejections are based on combinations of references.  See *In re Keller*, 642 F.2d 413, 208 USPQ 871 (CCPA 1981); *In re Merck & Co.,* 800 F.2d 1091, 231 USPQ 375 (Fed. Cir. 1986).  ITOH teaches that fire resistant glazing structures comprising two plate components with an intervening space are well known in the art, while SAKAMOTO is relied upon to illustrate that it is well known to increase the impact resistance and other mechanical properties of glazing components by laminating polymeric films to glass.

(E) Applicant argues that ITOH teaches away from the claimed invention because it requires that facing  surfaces of the two plate components be subjected to specific surface treatment.  However, the present claims do not preclude such surface treatments, nor are such surface treatments incompatible with the laminates of SAKAMOTO.

(F) Applicant argues that there is no motivation to select wire glass from the list of possible glazing materials.  However, since wire glass has known benefits and advantages (e.g.,

Application/Control Number: 10/238,115                                    Page 7
Art Unit: 1773

improved fire resistance or penetration resistance, etc.), one of ordinary skill in the art would

have utilized wire glass in applications where fire resistance and security are significant

considerations, since it has been held to be within the general skill of a worker in the art to select

a known material on the basis of its suitability for the intended use as a matter of obvious design

choice. In re Leshin, 125 USPQ 416. Applicant has not provided any probative evidence of

unexpected results or criticality from the use of wire glass.

(G) Applicant argues that claimed invention is nonobvious over the prior art because the

structures taught or suggested by the prior art contain more elements than the claimed invention.

In response to applicant's argument that the references fail to show certain features of applicant's

invention, it is noted that the features upon which applicant relies (i.e., the elimination of a

second plate or glazing component, etc.) are not recited in the rejected claim(s). Although the

claims are interpreted in light of the specification, limitations from the specification are not read

into the claims. See *In re Van Geuns*, 988 F.2d 1181, 26 USPQ2d 1057 (Fed. Cir. 1993).

Application/Control Number: 10/238,115                                          Page 8
Art Unit: 1773

### *Conclusion*

5.      Any inquiry concerning this communication or earlier communications from the
examiner should be directed to Vivian Chen whose telephone number is (571) 272-1506. The
examiner can normally be reached on Monday through Thursday from 8:30 AM to 6 PM. The
examiner can also be reached on alternate Fridays.

        If attempts to reach the examiner by telephone are unsuccessful, the examiner's
supervisor, Carol Chaney, can be reached on (571) 272-1284. The fax phone number for the
organization where this application or proceeding is assigned is (703) 872-9306.

        The General Information telephone number for Technology Center 1700 is (571) 272-
1700.

        Information regarding the status of an application may be obtained from the Patent
Application Information Retrieval (PAIR) system. Status information for published applications
may be obtained from either Private PAIR or Public PAIR. Status information for unpublished
applications is available through Private PAIR only. For more information about the PAIR
system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR
system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).

April 14, 2005

Vivian Chen
Primary Examiner
Art Unit 1773



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/238,115 | 09/10/2002 | William O'Keeffe | OKEF-07982US1 DBB/SRM | 6410 |

23910      7590      11/01/2005

FLIESLER MEYER, LLP
FOUR EMBARCADERO CENTER
SUITE 400
SAN FRANCISCO,. CA  94111

| EXAMINER |
|---|
| CHEN, VIVIAN |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1773 | |

DATE MAILED: 11/01/2005

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

| *Office Action Summary* | Application No. | Applicant(s) |
|---|---|---|
| | 10/238,115 | O'KEEFFE, WILLIAM |
| | Examiner | Art Unit | |
| | Vivian Chen | 1773 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) FROM
THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed
  after SIX (6) MONTHS from the mailing date of this communication.
- If the period for reply specified above is less than thirty (30) days, a reply within the statutory minimum of thirty (30) days will be considered timely.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any
  earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on <u>18 July 2005 and 19 July 2005</u>.

2a)☒ This action is **FINAL**.        2b)☐ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is
closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) <u>1-3,8,17,18 and 21-25</u> is/are pending in the application.

    4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) <u>1-3,7,17,18 and 21-25</u> is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.

10)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All   b)☐ Some * c)☐ None of:

      1.☐ Certified copies of the priority documents have been received.

      2.☐ Certified copies of the priority documents have been received in Application No. _____.

      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage
application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)

2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3)☐ Information Disclosure Statement(s) (PTO-1449 or PTO/SB/08)
    Paper No(s)/Mail Date _____.

4)☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date. _____.

5)☐ Notice of Informal Patent Application (PTO-152)

6)☐ Other: _____.

Application/Control Number: 10/238,115                                    Page 2

Art Unit: 1773

**DETAILED ACTION**

*Claim Rejections - 35 USC § 103*

1.      Claims 1-3, 8, 17-18, 21-25 are rejected under 35 U.S.C. 103(a) as being unpatentable

over:

SAKAMOTO ET AL (US 5,230,954) or SAKAMOTO ET AL (US 5,624,761).

in view of Applicant's admissions.

SAKAMOTO ET AL '954 or '761 discloses an impact resistant, fire resistant laminates

comprising a fire resistant polymeric film adhered to a first wire glass sheet, wherein an optional

second wire glass sheet can be further bonded to the first wire glass sheet. (SAKAMOTO ET AL

'954, Figures 1-2; line 53, col. 2 to line 10, col. 3) (see corresponding portions of SAKAMOTO

ET AL '761)  However, the references do not explicitly disclose the recited impact resistance.

Applicant admits that current minimum safety glazing standards require an impact

resistance of at least 100 ft-lbs (Applicant's Specification, page 1, paragraph 0008).

It would have been obvious to a person of ordinary skill in the art at the time the

invention was made to select the thickness and mechanical properties of the various layers in

SAKAMOTO ET AL '954 or '761 in order to obtain sufficient impact resistance to meet or

exceed established safety standards (claims 1, 17, 24). It is well known in the art to incorporate

known colorants in polymer films used in glazing applications (claim 8) in order to obtain

specific aesthetic or light filtering effects.  One of ordinary skill in the art would have applied a

known heat-reflective layer such as metal to a fire resistant glazing film in order to minimize

heat transmission through the glazing structures (claims 22-23).

Application/Control Number: 10/238,115                                      Page 3
Art Unit: 1773

2.      Claims 22-23 are rejected under 35 U.S.C. 103(a) as being unpatentable over:

        (a) SAKAMOTO ET AL (US 5,230,954) or SAKAMOTO ET AL (US 5,624, 761).

in view of Applicant's admissions;

        as applied to claim 1 above,

        and further in view of FARMER ET AL (US 4,973,511).

        FARMER ET AL discloses that it is well known in the art to apply thin metal coatings

comprising stainless steel or other metals to polymeric films for use in safety glazing

applications in order to minimize heat transmission through the glazing (lines 45-60, col. 2; lines

64-66, col. 3; lines 30-35, col. 5)

        It would have been obvious to one of ordinary skill in the art at the time the invention

was made to apply a known heat-reflective layer such as metal to a fire resistant glazing film in

order to minimize heat transmission through glazing structures (claims 22-23).


                                    *Response to Arguments*

3.      Applicant's arguments filed 7/19/2005 have been considered but are moot in view of the

new ground(s) of rejection.


                                    *Allowable Subject Matter*

4.      Claims 3, 18 are objected to as being dependent upon a rejected base claim, but would be

allowable if rewritten in independent form including all of the limitations of the base claim and

any intervening claims.

Application/Control Number: 10/238,115                                      Page 4
Art Unit: 1773

5.    The following is a statement of reasons for the indication of allowable subject matter:

The prior art of record fails to disclose or suggest fire resistant safety glass laminates consisting

essentially of a wire glass sheet and a fire resistant PET film, with said laminate having the

recited impact resistance (claims 3, 18).


### *Conclusion*

6.    Applicant's amendment necessitated the new ground(s) of rejection presented in this

Office action.  Accordingly, **THIS ACTION IS MADE FINAL**.  See MPEP § 706.07(a).

Applicant is reminded of the extension of time policy as set forth in 37 CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action.  In the event a first reply is filed within TWO

MONTHS of the mailing date of this final action and the advisory action is not mailed until after

the end of the THREE-MONTH shortened statutory period, then the shortened statutory period

will expire on the date the advisory action is mailed, and any extension fee pursuant to 37

CFR 1.136(a) will be calculated from the mailing date of the advisory action.  In no event,

however, will the statutory period for reply expire later than SIX MONTHS from the date of this

final action.

Application/Control Number: 10/238,115                                     Page 5
Art Unit: 1773

7.      Any inquiry concerning this communication or earlier communications from the examiner should be directed to Vivian Chen whose telephone number is (571) 272-1506. The examiner can normally be reached on Monday through Thursday from 8:30 AM to 6 PM. The examiner can also be reached on alternate Fridays.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Carol Chaney, can be reached on (571) 272-1284. The fax phone number for the organization where this application or proceeding is assigned is (571) 273-8300.

The General Information telephone number for Technology Center 1700 is (571) 272-1700.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).

October 28, 2005

Vivian Chen
Primary Examiner
Art Unit 1773



US005462805A

# United States Patent [19]

## Sakamoto et al.

[11] **Patent Number:** **5,462,805**

[45] **Date of Patent:** **Oct. 31, 1995**

[54] **FIRE-PROTECTION AND SAFETY GLASS PANEL**

[75] Inventors: **Akihiko Sakamoto; Tadashi Takahashi; Masayuki Ninomiya**, all of Shiga, Japan

[73] Assignee: **Nippon Electric Glass Co., Ltd.**, Otsu, Japan

[21] Appl. No.: **99,226**

[22] Filed: **Jul. 29, 1993**

[30] **Foreign Application Priority Data**

Jul. 30, 1992 [JP] Japan ..................................... 4-223470

[51] Int. Cl.[6] ...................................................... **B32B 9/00**
[52] U.S. Cl. ........................ **428/430**; 428/215; 428/410; 428/426; 428/480; 428/911; 428/913; 428/920
[58] Field of Search ...................................... 428/458, 432, 428/437, 141, 524, 480, 215, 412, 410, 426, 911, 913, 920; 526/87

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,900,673 | 8/1975 | Mattimoe et al. | 428/339 |
| 4,358,329 | 11/1982 | Masuda | 156/106 |
| 4,382,996 | 5/1983 | Mori et al. | 428/442 |
| 4,910,074 | 3/1990 | Fukawa et al. | 428/215 |
| 4,911,984 | 3/1990 | Parker | 428/428 |
| 4,952,460 | 8/1990 | Beckmann et al. | 428/429 |

| | | | |
|---|---|---|---|
| 5,002,820 | 3/1991 | Bolton et al. | 428/215 |
| 5,091,258 | 2/1992 | Moran | 428/437 |
| 5,091,487 | 2/1992 | Hori et al. | 526/87 |
| 5,145,746 | 9/1992 | Tomoyuki | 428/458 |
| 5,219,630 | 6/1993 | Hickman | 428/38 |
| 5,230,954 | 7/1993 | Sakamoto et al. | 428/332 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 684017 | 7/1966 | Belgium . |
| 1905619 | 8/1970 | Germany . |
| 480276 | 12/1969 | Switzerland . |

*Primary Examiner*—Patrick J. Ryan
*Assistant Examiner*—William A. Krynski
*Attorney, Agent, or Firm*—Hopgood, Calimafde, Kalil & Judlowe

[57] **ABSTRACT**

In a fire-protection and safety glass panel having a transparent appearance and dual functions as a fire protection glass for shutting out flame and smoke for a long period of time upon occurrence of fire and as a safety glass which is neither shattered into pieces nor forms any through hole if it is broken in an ordinary life, a PET (polyethylene terephthalate) film (**12**) is arranged between a first glass plate (**10**) and a second glass plate (**11**). The first and the second glass plates (**10** and **11**) and the PET film (**12**) are adhered through transparent acrylic adhesive agent layers (**13** and **14**), respectively. An intermediate resin layer comprises the PET film (**12**) and the adhesive agent layers (**13** and **14**) and has a thickness between 75 and 200 μm.

**14 Claims, 3 Drawing Sheets**





# FIG. I



51 — — 52

## FIG. 2



62

63

61

## FIG. 3

**U.S. Patent**     Oct. 31, 1995     Sheet 3 of 3     **5,462,805**



HEAT CURVE FOR FIRE-RESISTING TEST

FIG. 4

5,462,805

# 1

## FIRE-PROTECTION AND SAFETY GLASS PANEL

### BACKGROUND OF THE INVENTION

This invention relates to a fire-protection and safety glass panel which serves as a fire-protection panel upon occurrence of fire and as a safety glass panel in an ordinary life.

With recent increase of large-sized architectures such as multistory buildings, department stores, and supermarkets, there is a demand for a fire-protection and safety glass panel having dual functions as a fire protection panel for shutting out flame and smoke upon occurrence of fire to thereby suppress the spread of the fire at a minimum and as a safety glass panel which is neither shattered into pieces and nor forms a through hole if it is broken in an ordinary life.

A conventional fire-protection panel comprises a low-expansion crystallized glass plate, a borosilicate glass plate, or a wire mesh glass plate (a wire glass plate). On the other hand, a conventional safety glass panel comprises a laminated glass plate including a plurality of soda lime glass plates and a transparent polyvinyl butyral film or films (PVB film) joined by thermocompression bonding to provide a structure which comprises a plurality of glass plates with an intermediate resin layer or layers interposed therebetween. Another conventional safety glass panel comprises a soda lime glass plate with an antishattering film applied on a surface thereof. However, a fire-protection and safety glass panel which has both a fire protection function and a safety function has not yet been known.

If the glass panel is heated upon occurrence of fire, it is thermally cracked to form a through hole. In particular, when the above-mentioned laminated glass plate is heated, the PVB film is decomposed to produce a combustible gas. The gas is blown to a nonheated side and inflamed to accelerate the spread of the fire. For thermocompression bonding of the transparent film, a large-sized heating furnace is required so that the laminated glass plate is completely received therein. Furthermore, when a plurality of the glass plates have different thermal expansion coefficients and the PVB film is thermocompression bonded to the glass plates to provide an intermediate resin layer therebetween, a warp is caused to occur due to the difference in contraction of the glass plates during cooling.

On the other hand, the low-expansion crystallized glass plate or the borosilicate glass plate used as the fire protection panel is easily broken due to mechanical impact in the ordinary life to be shattered into pieces or dropped off. The wire mesh glass plate has a safety effect to some extent. However, if the glass plate is subjected to a great impact, for example, due to strong collision of a human body, a wire mesh will be cut off to form a through hole. In this event, the human body may be injured.

There are known incombustible transparent films such as a fluoric resin film. However, this film is very expensive and slightly opaque. Accordingly, it is difficult to obtain a laminated glass panel having a high transparency. In addition, this film is poor in evenness. When this film is adhered to the glass plate, air bubbles easily enter into a gap formed therebetween. It is therefore difficult to obtain a transparent appearance.

### SUMMARY OF THE INVENTION

It is therefore an object of this invention to provide a fire-protection and safety glass panel having dual functions as a fire-protection glass panel for shutting out flame and smoke for a long period of time on occurrence of fire and as

# 2

a safety glass which is neither shattered into pieces nor forms a through hole if it is broken in an ordinary life.

It is another object of this invention to provide a fire-protection and safety glass panel of the type described, which has a transparent appearance.

It is still another object of this invention to provide a glass window comprising a fire-protection and safety glass panel having dual functions as a fire-protection glass panel for shutting out flame and smoke for a long period of time on occurrence of fire and as a safety glass panel which is neither shattered into pieces nor forms a through hole if it is broken in an ordinary life.

It is yet another object of this invention to provide a glass window of the type described, which comprises the fire-protection and safety glass panel having a transparent appearance.

It is a further object of this invention to provide a glass door comprising a fire-protection and safety glass panel having dual functions as a fire-protection glass panel for shutting out flame and smoke for a long period of time on occurrence of fire and as a safety glass panel which is neither shattered into pieces nor forms a through hole if it is broken in an ordinary life.

It is a still further object of this invention to provide a glass door of the type described, which comprises the fire-protection and safety glass panel having a transparent appearance.

Other objects of this invention will become clear as the description proceeds.

A fire-protection and safety glass panel to which this invention is applicable comprises a first glass plate, a second glass plate opposite to the first glass plate, and an intermediate resin layer between the first and the second glass plates. At least one of the first and the second glass plates is a heat-resistant glass plate.

According to this invention, the intermediate resin layer comprises a polyethylene terephthalate film and has a thickness which is not greater than 200 µm.

A glass window to which this invention is applicable comprises a fire-protection and safety glass panel and a sash for the fire-protection and safety glass panel. The fire-protection and safety glass panel comprises a first glass plate, a second glass plate opposite to the first glass plate, and an intermediate resin layer between the first and the second glass plates. At least one of the first and the second glass plates is a heat-resistant glass plate.

According to this invention, the intermediate resin layer comprises a polyethylene terephthalate film and has a thickness which is not greater than 200 µm.

A glass door to which this invention is applicable comprises a fire-protection and safety glass panel and a frame for the fire-protection and safety glass panel. The fire-protection and safety glass panel comprises a first glass plate, a second glass plate opposite to the first glass plate, and an intermediate resin layer between the first and the second glass plates. At least one of the first and the second glass plates is a heat-resistant glass plate.

According to this invention, the intermediate resin layer comprises a polyethylene terephthalate film and has a thickness which is not greater than 200 µm.

In order to achieve the above-mentioned objects, the present inventors have made extensive researches. As a result, it is found out that a material interposed in each gap between the first and the second glass plates must have a thickness not greater than a predetermined value. Even if the

5,462,805

3

material is combustible or fire-retarding and the combustible gas is blown to the nonheated side, the gas is prevented from being inflamed because its density is thin.

When a heat-resistant glass plate is used as at least one of the glass plates, a fire protection effect is improved to provide a function as a fire-protection panel. Furthermore, when the polyethylene terephthalate film is used as the material interposed in each gap between the first and the second glass plates, a sufficient safety effect is obtained even if the thickness is small. This is because the tensile strength is excellent upon reception of an impact.

According to this invention, the polyethylene terephthalate film (hereinafter referred to as a PET film) is used as a material of the intermediate resin layer. This is because the film is fire-retarding and excellent in transparency and evenness. In addition, the film can be formed into an extremely small thickness, specifically, not greater than 25 μm. Furthermore, this film is excellent in strength and little in extension so that a tensile strength is high even if the thickness is small.

As the heat-resistant glass plate used in this invention, use can be made of a low-expansion crystallized glass plate, a borosilicate glass plate, or a wire glass plate. Taking the transparency and the heat resistance into consideration, the low-expansion crystallized glass plate is preferable.

The low-expansion crystallized glass plate is of a crystallized glass which exhibits thermal expansion substantially equal to zero upon occurrence of fire. Specifically, a preferable crystallized glass has a composition consisting by weight of 3–5% $Li_2O$, 20–35% $Al_2O_3$, 55–70% $SiO_2$, 1–3% $TiO_2$, 1–4% $ZrO_2$, 1–5% $P_2O_5$, 0–4% $Na_2O$, 0–4% $K_2O$, 0.5–4% $Na_2O+K_2O$, precipitates β-quartz solid solution crystals, and has a thermal expansion coefficient between $-10\times10^{-7}/°$ C. and $15\times10^{-7}/°$ C. (30°–750° C.).

According to this invention, at least one of the first and the second glass plates is a heat-resistant glass plate. Each of the other glass plates does not need to be a heat-resistant glass plate but may be a soda lime glass plate.

When the borosilicate glass plate or the soda lime glass plate is used in this invention, it is preferable to chemically or thermally reinforce the glass plate in order to improve the impact resistance.

The transparent adhesive agent used in this invention may be any appropriate material which is available at a low cost, excellent in transparency, and strong in adhesion so that a large-sized glass plate and the PET film can be strongly bonded. At present, only combustible and fire-retarding materials satisfy all of the above-mentioned properties. Taking a material cost and a workability into consideration, acrylic or vinyl transparent adhesive agents are preferable.

In order to prevent air bubbles from entering into a gap between the glass plate and the intermediate resin layer as little as possible, it is preferable to use a glass plate having a surface undulation not greater than 2 microns and to suppress a surface undulation of a transparent adhesive agent coated on the PET film to a value not greater than 2 microns.

According to this invention, at least one glass plate comprises a heat-resistant glass plate. When the glass plate is heated upon occurrence of fire, no through hole allowing passage of flame and smoke is formed during a predetermined period of time so that the spread of the fire can be avoided.

According to this invention, it is sufficient that at least one glass plate is a heat-resistant glass plate. Each of the other

4

glass plates does not need to be a heat-resistant glass plate but may be a soda lime glass plate.

According to this invention, each intermediate resin layer desirably has a thickness not greater than 200 μm, preferably, not greater than 100 μm. The reasons are as follows.

The first reason will be described. When the fire-protection and safety glass panel according to this invention is heated upon occurrence of fire, the PET film and the transparent adhesive agent forming the intermediate layer are decomposed to produce the combustible gas. If the intermediate resin layer has a thickness not smaller than 200 μm, a large amount of the combustible gas is produced so that the high-density gas is blown to the nonheated side. The gas will be inflamed by the heat of the fire to thereby spread the fire.

The second reason is as follows. When the fire-protection and safety glass panel according to this invention is heated upon occurrence of fire and the intermediate resin layer has a thickness not smaller than 200 μm, a large amount of the combustible gas will be produced as described above. This increases a pressure in the gap between the glass plates. Due to the pressure, the glass plate is easily broken.

The PET film is excellent in strength and little in extension. Accordingly, even if the thickness is small, the fire-protection and safety glass panel according to this invention has an excellent tensile strength. When the glass panel is subjected to an impact, deformation of the glass plate is suppressed and a high impact resistance is obtained.

## BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 is a sectional view of a fire-protection and safety glass panel according to an embodiment of this invention;

FIG. 2 is a front view of a glass window using the fire-protection and safety glass panel illustrated in FIG. 1; and

FIG. 3 is a perspective view of a glass door using the fire-protection and safety glass panel illustrated in FIG. 1.

FIG. 4 is illustrative of a standard heating curve as prescribed in the Official Notification No. 1125 of the Ministry of Construction in Japan.

## DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring to FIG. 1, a fire-protection and safety glass panel according to a preferred embodiment of this invention comprises a first glass plate 10, a second glass plate 11 opposite to the first glass plate, and an intermediate resin layer between the first and the second glass plates 10 and 11. At least one of the first and the second glass plates 10 and 11 is a heat-resistant glass plate. The intermediate resin layer comprises a polyethylene terephthalate film (namely, a PET film) 12 and first and second adhesive agent layers 13 and 14 and has a thickness which is not greater than 200 μm. The first adhesive agent layer 13 adheres the PET film 12 to the first glass plate 10. The second adhesive agent layer 14 adheres the PET film 12 to the second glass plate 11.

Each of the first and the second adhesive agent layers 13 and 14 is of either a silicone adhesive agent or an acrylic adhesive agent.

Each of the first and the second glass plates 10 and 11 is a transparent plate. The PET film 12 is a transparent film. Each of the first and the second adhesive agent layers 13 and 14 is a transparent layer.

The heat-resistant glass plate is of either a low-expansion

5,462,805

| 5 | 6 |

crystallized glass described above or a borosilicate glass. Alternatively, the heat-resistant glass plate is of a wire glass.

Table 1 shows structures and characteristics of this invention (Samples Nos. 1–3) and comparative examples (Samples Nos. 4–6).

The samples Nos. 1–5 in Table 1 have a structure illustrated in FIG. 1. The PET film 12 is held between the first glass plate 10 and the second glass plate 11. The glass plates 10 and 11 are adhered to the PET film 12 through transparent acrylic adhesive agent layers 13 and 14, respectively. Each of the samples Nos. 1–3 has the intermediate resin layer having a thickness of 75–200 μm while the samples Nos. 4 and 5 have intermediate resin layers having thicknesses of 200 μm and 250 μm, respectively.

Each of the samples Nos. 1–5 was prepared in a method which will presently be described.

At first, the transparent adhesive agent layer 13 was applied on one surface of the PET film 12. The adhesive-applied surface was brought into contact with one surface of the first glass plate 10. One ends thereof were inserted in a gap between two rubber rollers and then moved forward so that they were bonded together.

TABLE 1

| | This Invention | | | Comparative Example | | |
|---|---|---|---|---|---|---|
| | No. 1 | No. 2 | No. 3 | No. 4 | No. 5 | No. 6 |
| Glass Plate A | Crys-tallized Glass | Crys-tallized Glass | Crys-tallized Glass | Soda Lime Glass | Crys-tallized Glass | Boro-silicate Glass |
| Glass Plate B | Soda Lime Glass | Soda Lime Glass | Boro-silicate Glass | Soda Lime Glass | Boro-silicate Glass | Soda Lime Glass |
| Transparent Film | PET | PET | PET | PET | PET | PVB |
| Thickness of Transparent Film (μm) | 25 | 50 | 100 | 100 | 200 | 300 |
| Transparent Adhesive Agent | Acryl-ic | Acryl-ic | Acryl-ic | Acryl-ic | Acryl-ic | — |
| Thickness of Adhesive Agent (μm) | 25 | 25 | 50 | 50 | 25 | — |
| Thickness of Intermediate Resin Layer (μm) | 75 | 100 | 200 | 200 | 250 | — |
| Appearance | Trans-parent | Trans-parent | Trans-parent | Trans-parent | Trans-parent | Trans-parent |
| Inflammation | None | None | Self-extin-guish | Not Meas-ured | Not Meas-ured | Not Meas-ured |
| Fire Protection Time (minutes) | >180 | >180 | >180 | 17 | 22 | 6 |
| Impact Resistance (cm) | 72 | 120 | 140 | 140 | 140 | 100 |
| Warp (%) | <0.2 | <0.2 | <0.2 | <0.2 | <0.2 | 1.5 |

Thereafter, the transparent adhesive agent layer 14 was applied on the other surface of the PET film 12. The adhesive-applied surface was brought into contact with one surface of the second glass plate 11. In the manner similar to the foregoing, they were bonded together.

The sample No. 6 has a structure comprising a borosilicate glass plate and a soda lime glass plate with a PVB film thermocompression bonded therebetween.

As the crystallized glass plate in the table, use was made of a transparent crystallized glass having a dimension of

2000×900×5 mm and a thermal expansion coefficient of −5×10⁻⁷/° C. (FIRELITE (trade name): manufactured by Nippon Electric Glass Co., Ltd.). As the soda lime glass plate, use was made of a glass plate formed into a plate shape by an ordinary float method and having a dimension of 2000×900×3 mm and a thermal expansion coefficient of 85×10⁻⁷/° C. As the borosilicate glass, use was made of a glass plate formed into a plate shape by an ordinary down draw method and having a dimension of 2000×900×3 mm and a thermal expansion coefficient of 30×10⁻⁷/° C.

As is obvious from the table, each of the samples Nos. 1–3 according to this invention had a transparent appearance. In a fire protection test, no inflammation was caused at the nonheated side or, if the inflammation was caused, it was immediately self-extinguished. In addition, the fire protection time was as long as 180 minutes or more. The impact resistance was excellent and the warp was small.

On the other hand, each of the samples Nos. 4, 5, and 6 had a transparent appearance and an excellent impact resistance. However, in the sample No. 4 using no heat-resistant glass plate, each glass plate was broken in the fire protection test to form through holes allowing passage of flame and smoke. With the samples Nos. 5 and 6, the gas was blown to the nonheated surface and spontaneously inflamed in the fire protection test so that the fire protection time was as small as 6–22 minutes. It was therefore unnecessary to test the inflammation for each comparative example. The samples Nos. 4 and 5 exhibited a small warp while the sample 6 exhibited a warp as large as 1.5%.

In the table, the appearance was visually observed.

The inflammation was measured as follows. Each sample was located with one surface faced to an electric heater of an area heating type. Heating was carried out in accordance with a standard heating curve illustrated in FIG. 4 as prescribed in Official Notification No. 1125 of the Ministry of Construction of Japan. After the lapse of three minutes from the start of heating, a gas lighter was occasionally brought close to the gas blown to the nonheated side while it was observed whether or not the inflammation was caused to occur. In case when the gas lighter was inflamed, "none" is indicated. In case when the gas lighter was inflamed but no flame was produced on the nonheated side of the sample after the gas lighter was separated apart from the sample, "self-extinguish" is indicated.

Japanese Notification No. 1125, which was effective as of Jun. 30, 1990, relates to the certification of fire doors constructed to have fire prevention properties.

The testing method is carried out generally on specimens of size and thickness substantially the same as the actual product. The specimen is dried in dry air. Both surfaces of the fire door, depending on the type, are heated in a furnace for a time ranging from about 20 to 60 minutes, the temperature being measured by a chromel/alumel thermocouple, at least 9 thermojunctions being used to measure the heating temperature, the thermojunctions being uniformly spaced on the heating surface.

A successful test is one in which the specimen does not generate flames or form heating gaps or cracks when the backside of the surface is exposed to heat. In addition, an acceptable specimen should not generate smoke from the back side of the heated surface, etc.

After heating, a successful specimen should not exhibit physical damage, exfoliation detachment from the framework, etc.

The fire protection time was measured by subjecting each sample to the fire protection test twice wherein each surface was faced to a heating source. The time was measured until

5,462,805

7

spontaneous inflammation was caused to occur at the non-heated side of the sample or until the through hole allowing passage of flame or smoke was formed. A shorter one was selected for indication.

The impact resistance was examined in accordance with a shot bag test carried out in the following manner. Each sample was vertically fixed. In order to give an impact, a shot bag was made to collide with one surface of the sample with a gradual increase of a falling level. A maximum falling level H was determined at which no through hole was formed in the sample after reception of the impact and a total weight of a dropping part of the glass plate was not greater than 50 g. It is understood that the impact resistance is excellent when the falling level H is high.

The warp was measured by vertically arranging each sample and horizontally putting a straight ruler therealong. Indication is made at a percentage with respect to a horizontal length.

Although the above-mentioned embodiment is directed to the fire-protection and safety glass panel comprising the first and the second glass plates, this invention is not restricted thereto but is also applicable to a fire-protection and safety glass panel comprising three or more glass plates and two or more intermediate resin layers. In this case, each intermediate resin layer is disposed between adjacent ones of the glass plates.

As described above, the fire-protection and safety glass according to this invention has a transparent appearance and has dual functions as a fire-protection glass for shutting out flame and smoke during a long period of time upon occurrence of fire and as a safety glass which is neither shattered into pieces nor forms any through hole if it is broken in an ordinary life.

Turning to FIG. 2, a glass window comprises a fire-protection and safety glass panel 51 and a sash 52 for the fire-protection and safety glass panel 51. As the fire-protection and safety glass panel 51, the fire-protection and safety glass panel described in conjunction with FIG. 1 is used so that the window is a fire-protection and safety glass window.

Turning to FIG. 3, a glass door comprises a fire-protection and safety glass panel 61 and a frame 62 for the fire-protection and safety glass panel 61. The fire-protection and safety glass panel 61 so that the door is a fire-protection and safety glass door. The glass door is installed in an opening 63.

What is claimed is:

1. A fire-protection and safety glass panel comprising a first glass plate, a second glass plate opposite to said first glass plate, and an intermediate resin layer between said first and said second glass plates, at least one of said first and said second glass plates being a low-expansion crystallized glass plate of a low-expansion crystallized glass, wherein said intermediate resin layer comprises a polyethylene terephthalate film, a first adhesive agent layer for adhering said polyethylene terephthalate film to said first glass plate, and a second adhesive agent layer for adhering said polyethylene terephthalate film to said second glass plate, said intermediate resin layer having a thickness which is not greater than 200 μm.

2. A fire-protection and safety glass panel as claimed in claim 1, wherein each of said first and said second adhesive agent layers is of an adhesive agent selected from a group consisting of a silicone adhesive agent and an acrylic adhesive agent.

3. A fire-protection and safety glass panel as claimed in claim 1, wherein each of said first and said second glass

8

plates is a transparent plate, said polyethylene terephthalate film being a transparent film, each of said first and said second adhesive agent layers being a transparent layer.

4. A fire-protection and safety glass panel as claimed in claim 1, wherein said low expansion crystallized glass consists essentially of 3–5 wt % $Li_2O$, 20–35 wt % $Al_2O_3$, 55–70 wt % $SiO_2$, 1–3 wt % $TiO_2$, 1–4 wt % $ZrO_2$, 1–5 wt % $P_2O_5$, 0–4 wt % $Na_2O$ and 0–4 wt % $K_2O$, where a total amount of $Na_2O$ and $K_2O$ is 0.5–4 wt %, said low-expansion crystallized glass containing β-quartz solid solution crystals.

5. A glass window comprising a fire-protection and safety glass panel and a sash for said fire-protection and safety glass panel, said fire-protection and safety glass panel comprising a first glass plate, a second glass plate opposite to said first glass plate, and an intermediate resin layer between said first and said second glass plates, at least one of said first and said second glass plates being a low-expansion crystallized glass plate of a low-expansion crystallized glass, wherein said intermediate resin layer comprises a polyethylene terephthalate film, a first adhesive agent layer for adhering said polyethylene terephthalate film to said first glass plate, and a second adhesive agent layer for adhering said polyethylene terephthalate film to said second glass plate, said intermediate resin layer having a thickness which is not greater than 200 μm.

6. A glass window as claimed in claim 5, wherein each of said first and said second glass plates is a transparent plate, said polyethylene terephthalate film being a transparent film, each of said first and said second adhesive agent layers being a transparent layer.

7. A glass door comprising a fire-protection and safety glass panel and a frame for said fire-protection and safety glass panel said fire-protection and safety glass panel comprising a first glass plate, a second glass plate opposite to said first glass plate, and an intermediate resin layer between said first and said second glass plates, at least one of said first and said second glass plates being a low-expansion crystallized glass plate of a low-expansion crystallized glass, wherein said intermediate resin layer comprises a polyethylene terephthalate film, a first adhesive agent layer for adhering said polyethylene terephthalate film to said first plate, and a second adhesive agent layer for adhering said polyethylene terephthalate film to said second glass plate, said intermediate resin layer having a thickness which is not greater than 200 μm.

8. A glass door as claimed in claim 7, wherein each of said first and said second glass plates is a transparent plate, said polyethylene terephthalate film being a transparent film, each of said first and said second adhesive agent layers being a transparent layer.

9. A fire-protection and safety glass panel comprising a plurality of glass plates and an intermediate resin layer between adjacent ones of said plurality of glass plates, at least one of said plurality of glass plates being a low-expansion crystallized glass plate of a low-expansion crystallized glass, wherein said intermediate resin layer comprises a polyethylene terephthalate film, a first adhesive agent layer for adhering said polyethylene terephthalate film to one of said adjacent ones of said plurality of glass plates, and a second adhesive agent layer for adhering said polyethylene terephthalate film to the other of said adjacent ones of said plurality of glass plates, said intermediate resin layer having a thickness which is not greater than 200 μm.

10. A fire-protection and safety glass panel as claimed in claim 9, wherein each of said plurality of glass plates is a transparent plate, said polyethylene terephthalate film being a transparent film, each of said first and said second adhesive

5,462,805

**9**

agent layers being a transparent layer.

**11.** A glass window comprising a fire-protection and safety glass panel and a sash for said fire-protection and safety glass panel, said fire-protection and safety glass panel comprising a plurality of glass plates and an intermediate resin layer between adjacent ones of said plurality of glass plates, at least one of said plurality of glass plates being a low-expansion crystallized glass plate of a low-expansion crystallized glass, wherein said intermediate resin layer comprises a polyethylene terephthalate film, a first adhesive agent layer for adhering said polyethylene terephthalate film to one of said adjacent ones of said plurality of glass plates, and a second adhesive agent layer for adhering said polyethylene terephthalate film to the other of said adjacent ones of said plurality of glass plates, said intermediate resin layer having a thickness which is not greater than 200 μm.

**12.** A glass window as claimed in claim **11**, wherein each of said plurality of glass plates is a transparent plate, said polyethylene terephthalate film being a transparent film, each of said first and said second adhesive agent layers being a transparent layer.

**13.** A glass door comprising a fire-protection and safety

**10**

glass panel and a frame for said fire-protection and safety glass panel, said fire-protection and safety glass panel comprising a plurality of glass plates and an intermediate resin layer between adjacent ones of said plurality of glass plates, at least one of said plurality of glass plates being a low-expansion crystallized glass plate of a low-expansion crystallized glass, wherein said intermediate resin layer comprises a polyethylene terephthalate film, a first adhesive agent layer for adhering said polyethylene terephthalate film to one of said adjacent ones of said plurality of glass plates, and a second adhesive agent layer for adhering said polyethylene terephthalate film to the other of said adjacent ones of said plurality of glass plates, said intermediate resin layer having a thickness which is not greater than 200 μm.

**14.** A glass door as claimed in claim **13**, wherein each of said plurality of glass plates is a transparent plate, said polyethylene terephthalate film being a transparent film, each of said first and said second adhesive agent layers being a transparent layer.

*    *    *    *    *