Kimball R. Anderson (Admitted *pro hac vice*)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601-9703
Telephone:    312-558-5600
Facsimile:    312-558-5700
Email: kanderson@winston.com

Daniel F. Bailey (SBN 205888)
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111-5894
Telephone:    415-591-1000
Facsimile:    415-591-1400
Email: dbailey@winston.com

Attorneys for Third-Party Defendant
UNDERWRITERS LABORATORIES INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE BRANCH

| | |
|---|---|
| O'KEEFFE'S, INC., <br><br>　　　　Plaintiff, <br><br>　　v. <br><br>TECHNICAL GLASS PRODUCTS; ANEMOSTAT; and PILKINTON PLC, <br><br>　　　　Defendants. | Case No. 07-cv-3535 JF <br><br>**DECLARATION OF CHARLES A. REGO** <br><br>Date:    February 1, 2008 <br>Time:    9:00 a.m. <br>Place:   Courtroom 3, 5th Floor <br>Judge:   The Honorable Jeremy Fogel |
| O'KEEFFE'S, INC., <br><br>　　　　Counterclaimant, <br><br>　　v. <br><br>TECHNICAL GLASS PRODUCTS, Counterdefendant; and UNDERWRITERS LABORATORIES INC., Third-Party Defendant. | |

Charles A. Rego states as follows:

1. I am employed by Underwriters Laboratories Inc. as its Senior Corporate Counsel. I am an attorney admitted to practice in the State of Illinois. I have personal knowledge of the facts stated herein.

2. Attached as Exhibit A to this Declaration is a true and accurate copy of Underwriters Laboratories Inc.'s UL Services Agreement with O'Keeffe's, Inc. dated September 15, 2005.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 10, 2007.

/s/ Charles A. Rego
Charles A. Rego

CHI:2017541.1



EXHIBIT A

L-40
05/05

| | |
|---|---|
| Subscriber No: | 367907001 |
| Employee No: | 06392 |
| (For Internal UL Use Only) | |

# UNDERWRITERS LABORATORIES INC. ®
## UL SERVICES AGREEMENT

**Choose a method to return the completed Agreement:**

Mail to: 2600 N. W. Lake Road, Camas, WA 98607

Fax to: _____   E-mail to: bryce.l.cornwell@us.ul.com

THIS AGREEMENT is made at Northbrook, Illinois, as of _____2005-09-15_____ by and between Underwriters Laboratories Inc. ("UL"), a not-for-profit Delaware corporation, 333 Pfingsten Road, Northbrook, Illinois 60062 and
O'KEEFFE'S INC

325 NEWHALL ST SAN FRANCISCO, CA 94124 UNITED STATES
*(Company Name, City and State [or Country if not in U.S.A.])*

(hereinafter sometimes referred to as "Subscriber").

Under this Agreement, Subscriber enters into a relationship with UL as: (a) an "Applicant" who submits devices, equipment, materials or systems ("products") to UL for investigation to assess the product's conformity with UL's requirements including, without limitation, the applicable standard and UL Procedure (the "Requirements") and the eligibility of those products for UL's Listing, Classification, Recognition, Verification, Follow-Up Service and/or other Service ("UL Service"); (b) a "Manufacturer" who manufactures or assembles products covered by UL Service; and/or (c) a "Listee" whose name is listed in UL's published records in connection with products covered by UL Service. "Subscriber" shall refer to a party acting as an Applicant, Manufacturer or Listee unless otherwise indicated. UL will investigate submitted products. If UL determines, in its sole opinion, that such products are eligible for UL Service, UL will permit the use of UL's registered Certification Marks or other markings ("Marks") under the following terms and conditions:

**A.    Product Investigation Fees.** UL will establish a fee for each product investigation (including engineering, technical and support personnel charges). The fee covers one examination and set of tests that UL determines are appropriate for the product (not including testing of additional samples, separate investigation of components of a product, or reimbursable expenses), and the preparation of a report. The fee shall not be exceeded without written authorization.

**B.    Follow-Up Service Fees.** UL's Follow-Up Service is an integral part of UL Service and includes, without limitation, inspection of facilities where products covered by UL Service are manufactured or assembled, and additional testing to determine whether manufactured products are eligible for UL Service. UL will bill Applicant for Follow-Up Service at UL's current rates, which may change from time to time as determined by UL, in its sole discretion. Follow-Up Service charges may vary depending upon the nature and extent of the necessary inspection, testing and evaluation, including any extra costs resulting from the failure of a product to conform to UL's Requirements or insufficient Manufacturer quality control procedures.

**C.    Expenses.** Reimbursable expenses associated with a product investigation may include, without limitation: travel expenses; carrier, communications and special equipment charges; materials, energy and fuel; services of outside contractors or facilities; charges for photographs, drawings, reproductions and printing; and charges for preparation of extra copies of UL reports and other documents.

**D.    Deposits and Credit Information.** UL may require a deposit (to be credited against the total charges) before UL begins a product investigation. UL also reserves the right to share an Applicant's credit history and information with its affiliates.

**E.** Applicant shall be responsible for payment of all fees and expenses in connection with products submitted to UL or covered by UL Service. UL may render invoices for all UL Service on a monthly basis. All fees and reimbursable expenses associated with each product investigation shall be paid regardless of whether the product investigation results in any product being eligible for UL Service. The Applicant is responsible for payment of all bank fees incurred with wire transfers. All invoiced charges shall be paid in full without any set off or deductions such as bank charges, VAT or withholding tax upon presentation of invoices by UL, and Applicant shall be deemed to be in default if Applicant fails to pay such charges within thirty (30) days after presentment. UL shall not be financially responsible for any tax, expenses, or charges imposed or levied by the local authority or government in which Applicant is situated. UL may charge interest at the rate of 1.5% per month (18% per year), or the maximum legal rate, from the due date until paid and all costs of collection, including without limitation, reasonable attorneys fees and court costs allowable by law. If charges are not paid when due, UL may deny or withdraw UL Service for any of Subscriber's products. UL reserves the right to refuse to investigate or cancel the investigation of any product submitted at any time. All costs and expenses UL has incurred up to the date the product investigation is terminated shall be paid.

**SUBSCRIBER AGREES TO THE TERMS AND CONDITIONS ON ALL FOUR PAGES OF THIS AGREEMENT AND WARRANTS THAT NO ALTERATIONS OF ITS TEXT HAVE BEEN MADE WITHOUT UL'S PRIOR WRITTEN CONSENT. THE UNDERSIGNED REPRESENTS AND WARRANTS THAT S/HE IS AUTHORIZED TO EXECUTE THIS AGREEMENT ON BEHALF OF SUBSCRIBER.**

UNDERWRITERS LABORATORIES INC.                              O'Keeffe's Inc.
                                                            *(Subscriber's Complete Legal Company Name)*

By: _____[signature]_____                               By _____[signature]_____
                                                                    *(Signature)*

Stephen H. Wenc, Corporate Secretary                         William O'Keeffe, President
*(Typed Name and Title)*                                     *(Typed Name and Title)*

L-40
05/05

## 1.0 Establishment of UL Service.

**1.1** If UL determines that a product is eligible for UL Service, UL will prepare and lend a Follow-Up Service Procedure for the product (the "Procedure") to the Manufacturer(s). UL will issue the Procedure only after establishment of UL Service in the form and manner UL determines. The Procedure contains provisions and conditions identifying and defining the product, the UL Service and the conditions for use of the Marks in connection with the product, and the facilities at which UL Marks are to be applied. The parties agree that any Procedure prepared by UL for a product is hereby made a part of and incorporated by reference into this Agreement. In particular, the provisions and conditions of the Procedure shall govern the use of the Marks.

**1.2** Before UL establishes UL Service for a product, the Applicant will provide UL with the intended Listee's company name and address (if different than the Applicant) and the name of the Manufacturer(s) and address of the factory(ies) at which the product is manufactured or assembled. When UL Service is established, the Listee's name and the identification of the covered products will appear in UL's published records. Listee authorizes UL to publish its name and other information regarding the product in UL's published records. No UL Service will be established or maintained unless all appropriate Applicants, Listees and Manufacturers have executed and continue to comply with an agreement designated by UL.

**1.3** Subscriber acknowledges that the Manufacturer(s) of the product must demonstrate to UL's satisfaction that the Manufacturer(s) will produce the product in accordance with this Agreement including, without limitation, the Procedure. UL also reserves the right to conduct an "Initial Production Inspection" (IPI) to determine whether the manufactured products conform to UL's requirements. The Manufacturer(s) shall establish and maintain a program of production, inspection and tests to assure that products bearing the Marks comply with UL's Requirements. UL Service shall be terminated for any product that, for any reason, is no longer eligible for UL Service.

**1.4** Subscriber agrees that if a revision in UL's Requirements is adopted or the Requirements are withdrawn during the term of the Agreement, UL shall determine the date by which use of the Mark under the Requirements shall terminate and shall notify the Subscriber of such date. Subscriber agrees to comply with any such notice. If the Requirements are revised, the continued coverage of the product and the rights of the Subscriber to use the Mark beyond the specified date shall be contingent upon a revised product being submitted to UL, found to comply with the applicable Requirements, and appropriate revisions made in the Procedure. If the product is found not to comply with the revised Requirements, or if the Requirements are withdrawn, the coverage of the product shall be terminated on the specified date and the right to use the Mark will cease on that date. Where examination and/or testing of the product is necessary to determine its compliance with new or revised requirements, the cost of such determination shall be charged to the Applicant on the same basis as a new product submittal.

## 2.0 Conduct of Follow-Up Service.

**2.1** Subscriber agrees that UL representatives will make periodic examinations or tests of the products at factories where covered products are manufactured. UL may, from time to time, select samples at the factory, place of sale or elsewhere for examination or testing to determine compliance with UL's Requirements. UL's Follow-Up Service, and any sampling, inspections or tests conducted by UL as part of the Follow-Up Service, is designed to serve only as a check on the means the Manufacturer(s) use to determine compliance of the products with UL's Requirements and does not relieve Subscriber of any responsibility for its products. Subscriber agrees that UL may share the information it obtains from these tests and examinations with its affiliates and subcontractors worldwide.

**2.2** UL's representatives shall have free, unannounced, immediate, safe and secure access to factories or storage facilities where the products or any components are fabricated, processed, finished, stored or located, at all times during business hours or when the factory or storage facilities are in operation in order for UL's representatives to perform their duties. Subscriber agrees to provide UL's representatives with all safety and other protections required by law for its own employees including, without limitation, all Occupational Health and Safety Administration rules and regulations. The right of UL's representatives to obtain free access to a factory or storage facility shall not be conditioned upon the execution by UL or the representative of any agreement, waiver, or release which in any way purports to affect the legal rights or obligations of UL or the representative. If UL's representatives sign such an agreement, waiver or release, it shall be considered void and have no force and effect. However, UL shall direct its representatives to exercise due care to comply with any plant safety regulations generally applicable to personnel at the factory or storage facility.

**2.3** The Manufacturer(s) shall make all Marks and the means of applying such Marks available for inspection by UL's representatives at all reasonable times. If UL's examination or tests disclose features which, in the sole opinion of UL's representative, are not in compliance with UL's Requirements, the Manufacturer(s) will either correct such items or remove the Marks from all products designated by the representative. If the Manufacturer(s) disagree with UL's representative regarding whether a product is eligible to use the Marks, the Manufacturer(s) may hold the product at the factory or storage facility pending an appeal to and a decision by UL.

## 3.0 Subscriber's Acknowledgements.

**3.1** Subscriber represents and warrants that all the information and data provided to UL by Subscriber or on its behalf is complete and accurate and that UL may rely upon such information when testing, investigating and establishing a UL Service for Subscriber's products. In the event that any UL Service is established, Subscriber agrees that it will comply with the applicable UL Requirements at all times including (a) the description, specifications, and Requirements contained in the Procedure; (b) the published Standard(s), if any, applicable from time to time to the covered product; and (c) the performance Requirements applied as a condition of UL Service.

**3.2** Subscriber recognizes that each product investigation is unique and that the timing of each investigation will vary depending upon the particular investigation and the findings. Subscriber agrees that UL, its trustees, members, officers, employees, subcontractors, and agents shall have no obligation or liability for any damages, including, without limitation, consequential damages, or for specific performance arising from UL's performance, non-performance, or delay in performance under this Agreement.

**3.3** Subscriber agrees that UL shall not be responsible for lost, damaged or destroyed samples or for injuries or damages of any nature caused by any sample. UL will return tested samples to Subscriber (insured for a nominal value) unless they are completely destroyed during UL's investigation or Subscriber instructs UL otherwise in writing.

L-40
05/05

**3.4** Subscriber agrees that UL does not assume or undertake to discharge any responsibility of Subscriber to any other party. Subscriber recognizes that UL's opinions and findings represent its judgment given with due consideration to the necessary limitations of practical operation in accordance with UL's objectives and purposes. Subscriber agrees that UL does not warrant or guarantee that its opinions or findings will be recognized or accepted.

**3.5** Subscriber recognizes that UL testing may be inherently hazardous. UL does not assume or accept responsibility or liability for any personal injury, death or property damage to Subscriber's personnel or property in connection with any tests performed at any location by any persons, including without limitation, personnel of UL, Subscriber or any third party, unless due to UL's sole negligence.

**3.6** Subscriber agrees to indemnify, defend and hold UL, its trustees, members, officers, employees, agents and subcontractors, harmless against any claims, suits, losses, judgments, costs, fines, liabilities or expenses, including, without limitation, attorneys' fees for counsel of UL's choosing, arising from any misuse by the Subscriber of the Marks or arising from any violation by the Subscriber of the terms and conditions of this Agreement.

**3.7** Subscriber acknowledges its willingness to support UL's public safety mission and that UL, as the certifier of Subscriber's products, is entitled to receive information developed or collected by Subscriber regarding the field performance of UL certified products. Subscriber agrees that UL may share such information with its affiliates and subcontractors worldwide. Accordingly, Subscriber will make available to UL for inspection and copying, all documents, test results, and other information with respect to a product (i) that is subject to Section 15(b) of the Consumer Product Safety Act, 15 U.S.C. § 2064(b); (ii) that fails to meet a consumer product safety standard or; (iii) that could create a substantial hazard to users. With respect to documents provided by Subscriber to the U.S. Consumer Product Safety Commission or any similar federal, state or local agency, Subscriber authorizes that agency to make those documents available to UL for inspection and copying. Subscriber further agrees that it will cooperate with and assist UL in connection with its investigation of any affected products and undertake such corrective action, including, without limitation, recall, where, in UL's sole opinion, such action is in the best interests of public safety.

**3.8** Subscriber represents and warrants that all information and data provided to UL by Subscriber or on its behalf are complete and accurate and that UL may rely thereon when providing Services.

**4.0 Confidentiality.** UL agrees not to voluntarily disclose secret information obtained in confidence from Subscriber to third parties, except UL's affiliates and subcontractors, without Subscriber's prior written authorization unless the information is already known to UL, publicly available, subsequently acquired from other sources, disclosure is required by law, disclosure is necessary to perform the requested Services or disclosure is in the interests of public safety. Subscriber agrees that UL, as an independent not-for-profit organization testing for public safety, will from time to time notify the public concerning products then or previously marketed where UL's investigations reveal that such products present, in UL's sole opinion, substantial hazards.

**4.1** Subscriber hereby authorizes UL to transmit unencrypted confidential information and other information through the Internet or a public network to e-mail addresses or other locations provided by Subscriber. Subscriber acknowledges that UL cannot guarantee the privacy and confidentiality of such transmissions. Subscriber agrees that UL's transmission of confidential information via the Internet or other public network shall not be a breach of any confidentiality obligation under this Agreement and that UL shall not be liable for any damages resulting from such transmissions.

**5.0 The UL Marks.** Subscriber acknowledges that UL is the owner of registered certification marks. Subscriber assumes full and complete responsibility for its use of the Marks. Subscriber agrees that it will, through proper inspection or otherwise, determine that products bearing the Marks have been made in compliance with UL's Requirements. Subscriber agrees that its use of the Marks constitutes its declaration that the products are covered by UL Service and have been made in compliance with UL's Requirements.

**5.1** Unless otherwise authorized by UL, the Marks shall be in the form of separable, legible labels not readily transferable from one product to another. Orders for separable labels shall be processed through UL and obtained only from a printer or manufacturer of Marks authorized by UL.

**5.2** Notwithstanding that the manufacturing cost of labels or other means of applying the Marks are not paid by UL, it is agreed that title to and control of labels, markers, or other means of marking shall be vested in UL until such time as the Marks are properly applied to the covered product in accordance with this Agreement. UL's representatives shall have the right, on demand, to acquire possession of any or all unused labels, markers, or other means of applying the Marks when, in the opinion of UL's representative, that action is warranted.

**5.3** Subscriber agrees that the manufacture, sale, delivery, shipment, distribution or promotion of any product utilizing a Mark or description referring to UL would mislead the public if such product is not covered by UL Service, does not comply with UL's Requirements, including without limitation the applicable standards or Procedure, or if the Marks are used in any other way than as provided in this Agreement and the applicable Procedure. Subscriber agrees that such a breach of this Agreement could not adequately be compensated for in money damages. Subscriber agrees that a temporary injunction may be issued at UL's request: (i) prohibiting Subscriber from using the Marks or referring to UL in any manner; (ii) prohibiting Subscriber from selling, offering for sale, delivering or distributing any products bearing the Marks or referring to UL in any way; (iii) prohibiting Subscriber from publishing UL reports or other documentation in any media, including without limitation on the Internet, after withdrawal of permission to apply the Mark to a product; or (iv) providing any other appropriate relief. The parties agree that such a temporary injunction shall not affect UL's right to compensatory or punitive damages for misuse of the Marks or UL's name, abbreviations or symbols and shall be in addition to, and not in lieu of, any other rights and remedies provided by this Agreement or law.

**5.4** Recognized Components are not eligible to bear the registered UL Listing Mark or Classification Marking. Manufacturers of components produced under UL's Recognition Service are only authorized to use the registered Recognized Component Mark or other specified Markings to identify the covered product.

**6.0 References to UL.** Subscriber acknowledges that UL owns several Marks including, without limitation, "Underwriters Laboratories Inc.," "UL" and the UL Recognized Component Mark. Subscriber shall not use Underwriters Laboratories Inc.'s name, or any abbreviation or symbol or Mark, thereof, on or in connection with products, containers or packaging, unless and until expressly authorized by the Procedure and then only in the form or manner specified in the Procedure, e.g., Subscriber may not refer to a product submitted for UL Service as "UL

L-40
05/05

pending." Subscriber agrees that UL may notify vendors, authorities, potential users and others of any improper or unauthorized use of the Marks or reference to UL when, in UL's sole opinion, necessary for public safety or the protection of the Marks.

**6.1  Use of UL Name and Marks in Advertising and Promotional Materials.** UL will permit the use of appropriate references to Underwriters Laboratories Inc., such as "Listed by Underwriters Laboratories Inc.," "Underwriters Laboratories Inc. Listed," "UL Listed," "Listed by U. L., Inc.," "Recognized by ...," "UL Recognized ...," or the form or text (wording) specified in the Procedure in promotional or advertising material, in any form including without limitation print or electronic media, solely in connection with covered products that bear the Marks, provided that in UL's sole opinion the promotional or advertising material is not in conflict with the findings and coverages of UL and that the reference to Underwriters Laboratories Inc. in no way tends to create a misleading impression as to the nature of UL's findings, its coverages and Service. Except for the Mark that is prescribed for use in a specific relevant Procedure, no other UL Marks may be used in the advertising and promotional material supplied with covered product. In those instances where a Mark is used, any text which is required by the Procedure shall be set forth in full.

**6.2  Hyperlinking to UL's Web Site.** If Subscriber hyperlinks to UL's Web site, Subscriber agrees: (i) the information contained on UL's Web site belongs to UL; (ii) the linking Web site will transfer the user directly to UL's Web site as posted by UL without imposing any frames, browser windows or third-party content; and (iii) the linking Web site may not state or imply that Subscriber or its products are endorsed by UL.

**7.0  Termination.** This Agreement will continue in effect until terminated as set forth below.

**7.1** Either party may terminate this Agreement, with or without cause, at any time upon thirty (30) days prior written notice to the other party. Any termination notice shall specify the proposed termination date. The parties agree that any notice of termination shall be sufficient if sent by registered or certified mail addressed to either UL (with copies to UL's Corporate Secretary and General Counsel) or Subscriber at its last known address. The notice period shall begin on the date a party deposits the notice in the mail, properly addressed and postage prepaid.

**7.2** UL may immediately terminate or suspend this Agreement at any time upon written notice to Subscriber if, among other things, Subscriber: (i) becomes insolvent or makes a general assignment for the benefit of creditors or a petition under the Bankruptcy Act is filed with respect to Subscriber; (ii) becomes involved in legal proceedings that, in UL's sole discretion, interfere with performance of this Agreement; or (iii) defaults in any of its obligations under this Agreement. Termination of this Agreement will not affect the parties' obligations existing as of the date of termination, shall not relieve the Subscriber of its indemnity obligations, or excuse Subscriber from paying any charges owing to UL.

Upon termination, with or without cause, of any rights or authority conferred by this Agreement, UL shall (a) discontinue UL Service on any affected products and/or (b) have the right to acquire possession of any Procedure or any unused Marks which, in its sole opinion, were issued for use in connection with any product that is the subject of the termination. Subscriber shall discontinue the use of the Marks on or in connection with any product that is the subject of such termination. Subscriber also shall discontinue any reference to UL in connection with any product which is the subject of such termination in promotion, advertising or otherwise. The foregoing does not in any way limit the actions that UL may take in the event of the termination of any rights or authority conferred by this Agreement.

**8.0  Export Controls/Trade Sanctions.** Subscriber represents and warrants that, during the term of this Agreement, it: (i) shall not cause UL to violate any trade sanction or export control laws, including those enforced by the United States ("U.S."); (ii) shall ensure that any payments made to or by UL or its affiliates will not be paid from or deposited into a financial institution or account subject to any trade sanction; and (iii) shall advise UL if a product or product component involves technology that is subject to any government export controls, including U.S. export controls, and if so, shall supply UL with all information needed or requested to comply with such controls, including any export control classification number (ECCN) or munitions classification number, before UL begins its evaluation.

**9.0  Waiver.** Any failure by a party to insist upon the performance of any provision of this Agreement shall not constitute a waiver of any rights under the Agreement or future performance of that provision.

**10.0  No Third Party Beneficiaries.** No provisions of this Agreement shall in any way inure to the benefit of any third party, including the public at large. The parties intend that no third party shall have any rights or cause of action under this Agreement.

**11.0  Governing Law.** This Agreement shall be governed by the laws of the State of Illinois, USA without reference to its choice of law principles. Any action related to the Agreement shall be filed in the federal or state court having jurisdiction in Cook County, Illinois, USA. The parties consent to the exercise of personal jurisdiction of that court and shall bear any costs, legal fees and expenses incurred in transferring actions filed elsewhere.

**12.0  Subcontracting.** Subscriber agrees that UL may, in its sole discretion, subcontract testing or other services. All subcontractors shall meet UL's current qualification requirements and comply with UL's requirements for confidentiality, conflicts of interest and ethical standards.

**13.0  No Assignment.** Subscriber may not assign any of its rights or obligations under this Agreement to any other person without UL's written authorization.

**14.0  Entirety of the Agreement.** This constitutes the entire and complete agreement between the parties and supersedes any other communications, representations or agreements with respect to its subject matter. This Agreement may only be modified by a writing duly executed by authorized persons for both parties. No preprinted additional or different terms or conditions on either party's purchase orders, invoices, sales or marketing materials or other business documents shall apply to any investigation or transaction under this Agreement. Subscriber represents and warrants that it is authorized to execute this Agreement; that its representative has read the Agreement and understands its terms; that each party has had access to legal counsel; and that each party intends to be legally bound by this Agreement.

COPYRIGHT©2005 UNDERWRITERS LABORATORIES INC.®