# EXHIBIT H

| | | |
|---|---|---|
| Katherine S Ritchey/JonesDay<br>Extension 3-5728<br>04/12/2008 09:48 PM | To | adam.wichman@klarquist.com, todd.siegel@klarquist.com |
| | cc | |
| | bcc | |
| | Subject | Further follow up on our meet and confer |

Adam and Todd,
I apologize for not getting this to you yesterday, as I had hoped.  As we discussed, even though we did not address them on a request by request basis, I want to be sure that O'Keeffe's position regarding ongoing inadequacies with the supplemental responses is clear.  I will try not to rehash points made in my April 2 letter or my email of April 8, although some overlap is probably unavoidable.  If TGP did not supplement a response, I will not reiterate the discussion in my April 2 letter, but will assume O'Keeffe's needs to make a motion to address any concerns stated therein (other than to the extent the letter merely seeks confirmation of my understanding, in which case I will consider it confirmed).

I want to acknowledge that while there are many unresolved issues, I appreciate that TGP's supplemental responses to the Requests for Production make significant movement from the original responses.  You have also stated that TGP has been and is in the process of collecting documents, which we appreciate.

We had further discussions regarding the overarching theme of what O'Keeffe's believes is TGP's unreasonably restrictive view of its discovery obligations as limited only to specific applications of FireLite products referenced in the pleadings.  As we previously discussed, this is wrong for a number of reasons:

First, as Adam repeatedly pointed out, discovery is proper if tied to a claim or defense.  O'Keeffe's claims are for false advertising, trade libel and unfair business practices.  The claims are not limited to the specific applications (*i.e.* transoms) identified in paragraphs 15 and 16 of O'Keeffe's counter claim that TGP references throughout its responses.  The discovery we have served is well within the claims that we allege.  It often also goes to our defenses.  Finally, a broad pattern of improper conduct, beyond specifically alleged claims, goes to wilfulness.

Second, as I explained on Monday and again Thursday, our allegations concern the fact that TGP puts its products into the marketplace in a manner that is likely to and does lead to confusion and misuse of its products.  Because your supplemental responses affirmatively deny my explanations, I will put some (but not all) of them in writing for you.  Historically within the industry, a 60 minute rating conveyed that a product was fire-resistant (blocks radiant heat, as well as smoke, fumes, etc.), where as 45 and lesser ratings were generally associated with fire protective products (only block smoke, fumes, etc.).  To this day there are still only limited applications for a 60/90 minute fire protective product -- it is functionally the same as 45 minute products with respect to where it can go.  Nonetheless, TGP puts its 60 minute products in the marketplace and represents that they are listed and/or fully code compliant, without disclosing that this is true only in 45 minute applications.  We also discussed that even in applications in which a 45 minute fire protective product can be used, TGP does not disclose significant limitations.  For example, a 45 minute window (such as FireLite products) can be used as a borrowed lite in a 60 minute fire partition wall *only if* it does not exceed 25% of the surface area.  Because we believe that TGP's marketing and sales process omits this type of critical information, responses narrowing the search to any particular statement are not sufficient.  The *lack* of statements is just as relevant as whatever statements are made.  I have given examples of false or misleading statements outside the context of the FireLite family of products, as well.  For example, TGP's website states that WireLite complies with ANSI Z97.1, which relates to impact ratings that WireLite does not have.  Accordingly, while I understand that the requests cover a broad spectrum of TGP products (including, but often not limited to, the full line of FireLite products), the reason for the breadth of the requests is the apparent breadth of what we contend are false and misleading statements by TGP.  While I continue to believe that the entire family of FireLite products is an appropriate topic of discovery, in the interest of narrowing, I agreed that TGP could exclude 20 minute FireLite products from its search and production (without prejudice to our ability to later seek these documents).  I reiterated my prior invitation for TGP to identify categories of documents that it believes should be excluded, rather than to merely announce unsupported limitations on its search.

On the specific request, TGP provides the identical supplemental response for RFPs 1, 2, 3, 10, 12 and 28, each of which are inappropriate. For the foregoing reasons, I believe these responses are unduly restrictive. I would also like to clarify that the FireLite family of products are at issue (*e.g.* FireLite NT, FireLite Plus, etc.), not just the product called FireLite. TGP makes the statement at the end of the response that it is unaware of requests to approve FireLite as an alternate. TGP's role in having FireLite *specified* in certain applications is as relevant as requests to approve it, which is why the several of these questions specifically ask about *both* seeking approval and specifying FireLite products and none limit the required document production. For example, if it gets a request for a 60 or 90 minute window, what information would be provided by TGP? If a request come in with specifications and blueprints, what information is provided? If a request for 60 minute FireLite comes in with a request for heat resistant frames (that normally are associated with fire resistant windows), how is that handled? These are just examples of circumstances in which TGP could make clear its product limitations to make sure that its marketing has not resulted in confusion.

I further explained the need for the documents requested, rather than the categories as narrowed by TGP. For example, RFP 1 and 2 seek documents and communications that refer or relate to any transaction, sale or installation of TGP's FireLite products. While communications with AHJs, design professionals and others may be part of the responsive documents, the estimates, bids, invoices, correspondence and other categories of responsive documents will provide significant relevant information including but not limited to: where in the sales process (if at all) does TGP disclose the performance limitations of its products, where are they being installed and why were they selected for a particular application (for example, if a sales representative suggested the product, or stated it meets the need). Moreover, estimates, invoices, etc. will show the size of the products and other information that may indicate the use -- for example, certain frames are associated with certain window characteristics and certain size windows are associated with transoms and sidelites. Even if particular words are not used, our experts may be able to use the information in support of their analysis.

In the supplemental response to RFP 3, TGP limits its response to communications about the applicability of radiant heat performance requirements to FireLite, but the request sought documents and communications referring to providing *performance* information to AHJs whether or not TGP did so in the context of discussing the applicability of any rule.

On RFP 4, I reiterated my position that by limiting the request to FireLite products, by definition the universe of applicable codes, standards and regulations is limited. Nonetheless, I offered that Kate Steel's declaration in opposition to UL's motion to dismiss contained many (but not necessarily all) applicable codes, standards and regulations. TGP's response indicates it is unaware of FireLite products being found noncompliant with the building codes and regulations. But the request is broader, and would include documents stating or suggesting FireLite does comply with a particular code, as well as more general statements of compliance (*e.g.* something like, but not limited to, "FireLite complies with all applicable codes").

The supplemental response to RFP 5 is unduly narrow. As I have stated, because O'Keeffe's claims relate to FireLite's actual performance as compared to how it is marketed and sold, all testing documents are relevant. The testing also could be relevant to a defense -- for example, if TGP's products fail hose stream tests, that could be relevant to disproving its assertions regarding the significance of that test. Also, communications regarding the testing, including communications to UL about the testing, are at issue.

On RFP 6 and 28, O'Keeffe's counterclaims allege that TGP capitalizes on UL listings as part of its unfair advertising. Accordingly, communications with UL, not just the actual testing, are relevant. The communications would include videos sent to UL, instructions from UL on what to send, correspondence, packing slips showing when and what were sent, etc. The list of products in your supplemental responses does not include Pyrodur, which TGP markets as blocking the majority of radiant heat. With respect to the list provided, I also want to confirm that documents regarding all products within each family of products (*i.e.* all FireLite, all WireLite, all FireGlass, etc.) are being produced.

On RFP 7, I wanted to confirm that "use" includes documents relating to the testing or safety characteristics of FireLite products, including any listing or delisting of FireLite products. If you intended something less, please let me know.

On RFP 9, the request seeks all documents and communications sent between TGP and "any person" about SuperLite I-XL. In light of the trade libel and other claims about disparagement of SuperLite I-XL, I do not believe it is appropriate to narrow the category of people to whom communications about O'Keeffe's products are made.

On RFP 10, please let me know if TGP intends something other than the list of people specified in the request by use of the term "design professionals."

On RFP 19, O'Keeffe's asked for all documents referring or relating to a specific statement. Marketing materials may be part of the responsive documents, but are not sufficient. In addition, any documents that show the factual basis, if any, for the statement or tend to disprove it would be relevant.

On RFP 21 and 25, TGP unduly narrows the requests to documents that "specifically refer to the hose stream test." I do not believe the exact words need to be part of the communications to be responsive. By way of example without limitation, TGP appears to equate the hose stream test with thermal shock and sprinklers. Responsive communications referencing these topics relate to the hose stream test, even if they don't refer to it, and should be produced. Also relevant are communications regarding opposing the code change requests, lobbying code officials/ICC committee members, discussion of tests, efforts to solicit opposition, sales of non-hose stream tested products abroad (and the lack of failures), etc. In short, there is no reason to limit production to a narrower category of documents than requested.

We also discussed TGP's responses to the interrogatories. In general, the interrogatories present the same issues as document requests, so I will not reiterate that discussion here. If you believe there is any interrogatory that is still unclear or that you do not understand the relevance of, I am happy to discuss it with you further on Monday.

We also discussed O'Keeffe's responses to TGP interrogatories 1 and 2. As a preliminary matter, we agreed that each party has issued the number of interrogatories that it has actually numbered, and no interrogatory will count for either party more than once. As we discussed, I will supplement the responses notwithstanding the fact that interrogatory number 2 references a code section that no longer exists and asks whether SuperLite I-XL is the equivalent without indicating a point of comparison. I hope that TGP will use this example to recognize that it is in no one's interest to be unduly technical in responding to discovery. I explained to you that while we would supplement, the interrogatories are impossible to answer because the circumstances in which SuperLite I-XL may be approved as an alternate without hose stream testing is a case by case analysis that depends on an infinite combination of factors. The statutory language and other authority contemplates a case by case analysis. Among the factors that may be considered (but by no means an exhaustive list) are: the floor plan of the project, the presence and details of a sprinkler system, the size of the window, the location of the window, the length/width of the corridor a window is present in, etc. In light of the many variables that may be present, an AHJ has authority to determine that a test in which the window is heated to over 1600 degrees and blasted from 20 feet with a two man fire hose is not germane to a window installed in a building in which sprinklers will trigger at 165 degrees and will have substantially less pressure than the hypothetical circumstance of the test. In fact, most exit corridors are six feet wide, and firefighters may very well break the windows out with an ax so they can get the hose to the seat of the fire. There simply is no way to describe all the circumstances that may lead to an AHJ approving a non-hose stream tested product as an alternate.

Thank you again for the progress that we have made. I look forward to talking to you on Monday to determine whether we can further narrow the issues in dispute.--k

Katherine S. Ritchey
JONES DAY

555 California Street, 26th Floor
San Francisco, CA 94104
Telephone (415) 875-5728
Facsimile (415) 875-5700

==========
This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege.  If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.
==========