Jeffrey S. Love (State Bar No. 195068)
jeffrey.love@klarquist.com
Todd M. Siegel (*Pro Hac Vice*)
todd.siegel@klarquist.com
Klarquist Sparkman, LLP
121 S.W. Salmon Street, Suite 1600
Portland, OR  97204-2988
Telephone:  (503) 595-5300
Facsimile:  (503) 595-5301

Eric L. Wesenberg (State Bar No. 139696)
ewesenberg@orrick.com
Gabriel M. Ramsey (State Bar No. 209218)
gramsey@orrick.com
Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone:  (650) 614-7400
Facsimile:  (650) 614-7401

Attorneys for Defendant Technical Glass Products

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| O'KEEFFE'S, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>TECHNICAL GLASS PRODUCTS, ANEMOSTAT AND PILKINGTON PLC,<br><br>    Defendants. | Case No.:  07-3535 JF (PVT)<br><br>**TECHNICAL GLASS PRODUCTS' OPPPOSITION TO O'KEEFFE'S MOTION TO COMPEL** |

# TABLE OF CONTENTS

Page

STATEMENT OF ISSUES ...................................................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................................1

I.   INTRODUCTION .....................................................................................................................1

II.  FACTUAL BACKGROUND ...................................................................................................2

    A.   O'Keeffe's Conclusory FireLite® Allegations..............................................................3

    B.   TGP's SuperLite I-XL Allegations ...............................................................................4

    C.   The Disputed Discovery Requests ................................................................................4

    D.   O'Keeffe's Building Project Requests
       (RFP Nos. 1-3, 10, 12, Interrogatory Nos. 4-9, 11) ......................................................5

    E.   TGP's Responses To O'Keeffe's Over Broad Building Project Requests ..................6

    F.   O'Keeffe's Code Compliance And Testing Requests ..................................................7

    G.   O'Keeffe's RFP Nos. 18-19, 21, And 25......................................................................8

III. ARGUMENT .............................................................................................................................8

    A.   O'Keeffe's Inc.'s Over Broad Requests Should Be
       Limited To The Claims And Defenses Identified In The Pleadings............................9

       1.   O'Keeffe's Requests Are Over Broad And Oppressive .................................11

       2.   O'Keeffe's Attempts To Clarify Its
           Allegations Also Fail To Support Broad Discovery ......................................13

       3.   Discovery Should Be Limited As
           Stated In TGP's Supplemental Responses.....................................................14

    B.   TGP Has Not Waived Its Objections..........................................................................16

IV.  CONCLUSION........................................................................................................................16

# TABLE OF AUTHORITIES

Page

**Cases**

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
   669 F.2d 620 (10th Cir. 1982) ....................................................................................................8

*Miller v. Pancucci*,
   141 F.R.D. 292 (C.D. Cal. 1992) ...............................................................................................10

*Oppenheimer Fund, Inc. v. Saunders*,
   437 U.S. 340, 351 (1978)...........................................................................................................10

*Surles v. Air France*,
   No. 00CIV5004 (RMBFM), 2001 WL 1142231, *1-2 (S.D.N.Y. Sep. 27, 2001) ....................13

*Surles v. Greyhound Lines, Inc.*,
   474 F.3d 288 (6th Cir. 2007) .......................................................................................................9

*Thompson v. Dep't Of Housing and Urban Development*,
   199 F.R.D. 168 (D. Md. 2001)....................................................................................9, 10, 14, 15

*Woodruff v. Hawaii Pac. Health*, No.
   CIV 05-00521 JMSLEK, 2008 WL 192980 (D. Haw. Jan. 23, 2008)..........................................10

**Statutes**

15 U.S.C. § 1125............................................................................................................................2

California Bus. & Prof. Code § 17200............................................................................................2

**Rules**

Federal Rules of Civil Procedure 26......................................................................................*passim*

**STATEMENT OF ISSUES**

1. Whether Fed. R. Civ. P. 26(b) precludes O'Keeffe's over broad discovery requests of, among other things, <u>all</u> documents, communications, sales quotes, orders, invoices, shipping confirmations, packing slips, etc. related to <u>all</u> building projects in which TGP's FireLite®, FireGlass®20, and Pyrodur™ products have been used in view of the cursory and conclusory allegations made in O'Keeffe's counterclaims.

2. Whether Fed. R. Civ. P. 26(b) precludes O'Keeffe's over broad discovery requests of all documents and communications sent between TGP and Underwriters Laboratories related to <u>any</u> TGP product passing or failing UL testing even though many TGP products are not mentioned in O'Keeffe's counterclaims.

3. Whether TGP is entitled to a protective order under Fed. R. Civ. P. 26(c) limiting O'Keeffe's to discovery tailored to O'Keeffe's allegations in its counterclaims as set forth in TGP's supplemental discovery responses.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

O'Keeffe's Motion to Compel ("Motion") seeks a fishing license for, among other things:

> **All documents, communications, and things** sent between TGP and any person, including building code officials, manufacturers, distributors, architects, specifiers, code consultants or glazing contractors, **relating to the <u>use</u> of FireLite in <u>any</u> building project**. (O'Keeffe's RFP No. 10) (emphasis added).[1]

Thus, without a proper showing of relevancy or need, O'Keeffe's is requesting TGP to produce any document ever sent to any person related to any project using any TGP FireLite® product (including FireLite®, FireLite Plus®, FireLite NT®, FireLite® IGU®). This and other extremely broad requests far exceed what is relevant to O'Keeffe's cursorily pled counterclaims for unfair competition and false advertising as they relate to TGP's products.

---

[1] Although O'Keeffe's RFP No. 10 is part of its Motion to Compel, O'Keeffe's omits this over broad Request from Ex. 3 to its Motion. (*See* Dkt. 109-4) (comparing the parties' respective discovery requests)

1    Seeking discovery on the use of any FireLite® product in any building project is oppressive
2 and will waste significant resources. TGP's responses and production to such broad requests have
3 been reasonable. TGP has searched for and produced documents that relate to the conduct recited in
4 O'Keeffe's claims – even though O'Keeffe's has not and apparently cannot identify a single actual
5 use of a TGP product in violation of an actual building code. Instead, O'Keeffe's merely alleges that
6 TGP's FireLite® products are "commonly sold" and "widely used" in violation of building codes.
7 (Dkt. 28, O'Keeffe's Counterclaim, ¶¶ 16, 18)  It is inappropriate for a party to use the Federal
8 Courts and Rules to accuse a competitor of improper conduct without identifying a specific example
9 of some wrongdoing, and then expect to be able to fish through all of its documents hoping to find
10 that example. O'Keeffe's fishing expedition should be denied.

## II.    FACTUAL BACKGROUND

Defendant Technical Glass Products ("TGP") and Plaintiff O'Keeffe's, Inc. ("O'Keeffe's") are direct competitors in the fire-rated glass industry. O'Keeffe's initially sued TGP, and others, on July 6, 2007, alleging infringement of U.S. Patent No. 7,090,906 ("'906 patent"). (Dkt. 1, Complaint)  In its Complaint, O'Keeffe's alleges that the PyroShield™ NT product infringes the '906 patent. The asserted patent was challenged as invalid in light of prior art, and is currently in reexamination before the United States Patent Office, prompting the Court to stay the patent case on November 16, 2007. (Dkt. 57)

Both TGP and O'Keeffe's added various unfair competition, trademark and trade-related counterclaims. (Dkt. 23, TGP Answer and Counterclaims; Dkt. 28, O'Keeffe's Counterclaim)  In particular, in its October 3, 2007 response, O'Keefe's added counterclaims for false or misleading advertising under the Lanham Act, 15 U.S.C. § 1125(a), and unfair competition under California Bus. & Prof. Code § 17200 and California common law, based in part on allegations concerning TGP's FireLite® products. (Dkt. 28)  TGP filed amended counterclaims on April 4, 2008. (Dkt. 98, Amended Counterclaims)

Pending settlement discussions, discovery was stayed on February 22, 2008, just two days after TGP served its written responses to O'Keeffe's first set of discovery requests. A settlement

conference on March 26, 2008 ended without resolving the parties' disputes, and on March 28, the Court partially lifted the discovery stay so that pending discovery disputes could be resolved.

### A. O'Keeffe's Conclusory FireLite® Allegations

O'Keeffe's counterclaims allege that TGP markets its FireLite® products for "uses" that are "not authorized" or "not permitted" by "standard codes." (*E.g.*, Dkt. 28, ¶ 15) Notwithstanding this conclusory pleading, O'Keeffe's alleges only three instances of uses or applications that might provide, in part, a factual basis for its FireLite®-related counterclaims. In particular, O'Keeffe's asserts that "FireLite offers very little protection against dangerous radiant heat," and then alleges three applications in which the product is purportedly misused by end users:

1) "building codes do not permit fire-protection-rated glazing in 60-90 minute door sidelights and transoms, nevertheless [FireLite] is commonly sold by TGP and used for such purposes, with TGP's approval and endorsement;"

2) "FireLite is not permitted in fire-rated 60-90 minute doors in panels of more than 100 square inches, nevertheless it is commonly sold by TGP and used for such purposes, and such is known to TGP, again with its approval;" and

3) "FireLite is commonly used for purposes which it is not approved, . . . for vision panels of more than 100 square inches in stairwell and exit enclosure doors."

(Dkt. 28, ¶¶ 15-16; *cf.* ¶¶ 34(a), 45-46, 49, 57(a))

Although O'Keeffe's alleges that FireLite® is "commonly sold" and "widely used" for three supposedly improper uses (*id.*, ¶¶ 16-18)—uses which are not necessarily improper[2]—O'Keeffe's

---

[2] O'Keeffe's counterclaims refer to certain fire-ratings, but do not reference particular building codes provisions which dictate whether a particular use of a fire-rated product is proper. For example, Sec. 715.4.4.1 of the International Building Code (2006) allows glazing to exceed 100 sq. inches in stairwells and exit doors if there are sprinklers. (Siegel Decl., Ex. 4) Moreover, Underwriters Laboratories ("UL"), an independent, unbiased, technically expert organization that determines whether a product meets recognized product safety standards (Dkt. 78-3, Schumann Decl., ¶ 3), lists TGP's 60-90 minute FireLite® products for uses in *sidelites and transoms*. (Razwick Decl., Ex. B)

[3] Exhibits 1-4 are attached to the Declaration of Todd M. Siegel ("Siegel Decl.") filed herewith. Exhibits A-E are attached to the Declaration of Jeff Razwick ("Razwick Decl.") filed herewith.

fails to identify even a single actual misuse of the FireLite® product by any end user, and fails to identify a single code provision violated by such hypothetical misuses by end users. Likewise, despite asserting that TGP purportedly "omits critical and essential performance limitations and shortcomings," purportedly gives its "approval and endorsement" to misuse of FireLite®, and purportedly "misrepresented the code applicability and standards" for FireLite®—O'Keeffe's fails to identify a single act by TGP that misrepresents the applicability of any code provision.

O'Keeffe's counterclaims appear based on speculation, concerning some hypothetical user's conduct, some hypothetical TGP representation, and an unidentified building code radiant heat requirement that purportedly prohibits the use of FireLite® in one of the three applications identified above.

**B.     TGP's SuperLite I-XL Allegations**

TGP's allegations against O'Keeffe's SuperLite I-XL product are much different, being based on facts. Specifically, most jurisdictions in the United States, including California and Washington, follow the International Building Code ("IBC") that requires fire-rated window products to have passed the "hose stream test" criteria described in national test standards before being used in applications requiring fire-ratings of at least 45-minutes. (*See* Dkt. 98, TGP's Supp. Counterclaim, ¶106). O'Keeffe's acknowledges SuperLite I-XL needs special approval for use, because, as it acknowledges publicly, SuperLite I-XL does not satisfy the "hose stream test." (*Id*., ¶¶ 112-19, Exs. Q-S, Dkt. 98-18-20) O'Keeffe's, nonetheless, actively encourages—on its website and elsewhere—seeking waivers of the required "hose stream test" so that SuperLite I-XL can be used in applications requiring a 45-minute (or higher) fire-rating. (*Id*.)

**C.     The Disputed Discovery Requests**

O'Keeffe's seeks discovery on thousands and thousands of communications and documents that TGP has sent to or received from customers and others, hoping to find some indication that TGP may have had at some time, some knowledge that its product was misused. This is a classic fishing expedition.

The discovery requests identified in O'Keeffe's Motion can be categorized as follows:

1. **Building project requests**: Requests for information regarding **all building projects** in which any FireLite®, as well as FireGlass®20 and Pyrodur™ product, has been used. (RFP Nos. 1-3, 10, 12; Interrogatory Nos. 4-9, 11)

2. **Code compliance and testing requests**: Requests for documents, including communications regarding the code compliance and testing of **all TGP products**. (RFP Nos. 4-6)

3. **Other miscellaneous requests**: Requests for documents supporting specific statements made by TGP (RFP Nos. 18-19), and requests for documents and communications related to O'Keeffe's proposed code changes related to the hose stream test. (RFP Nos. 21, 25)

D. **O'Keeffe's Building Project Requests (RFP Nos. 1-3, 10, 12, Interrogatory Nos. 4-9, 11)**

Despite the limited nature of O'Keeffe's counterclaim allegations, O'Keeffe's RFPs and Interrogatories demand an enormous amount of information regarding TGP's FireLite® products. (*See* Siegel Decl., Ex. 1, TGP's 2nd Suppl. Resp. to O'Keeffe's' RFPs; Ex. 2, TGP's 1st Suppl. Resp. to O'Keeffe's Interrogatories). For example, RFP Nos. 1-3 essentially seek all documents and things relating to any transaction or sale provided to any design professional or Authority Having Jurisdiction ("AHJ") approving or rejecting the use of FireLite® products requiring a fire-rating in excess of 45 minutes. Even broader, RFP Nos. 10 and 12 seek all documents and communications between TGP and any person, including building code officials, manufacturers, distributors, architects, specifiers, code consultants or glazing contractors relating to the use of FireLite® products in *any* building project. (Siegel Decl., Ex. 1). These Requests essentially request the production of any document associated with any transaction or project involving a FireLite® product, without regard to whether there has been some sort of building code violation known to TGP.

The disputed Interrogatories are similarly over broad. (*See* Siegel Decl., Ex. 2) Interrogatory No. 4 seeks the identity of all building projects for which the FireLite® products have been sold for 60 or 90 minute applications, and the identity of any document associated with the project. Interrogatory 8 seeks *generally* the identification of every single building project since 2003 for

1  which the FireLite® product has been sold and the total revenue and profits from such sales.
2  Interrogatory 9 seeks *generally* every building project that has rejected the FireLite® product for
3  failing to meet any building code and every detail about such instances. Interrogatory No. 11 asks
4  for the identity of every building project in which standard or polished FireLite® was used in fire
5  doors.

6        Interrogatory Nos. 5-7 are equally over broad, as they seek details regarding all building
7  projects for which TGP's Pyrodur™ and FireGlass®20 products have been sold, along with revenue
8  and profits from such sales.

9        These requests are not tailored to any specific, supposed code violation resulting from the use
10 of TGP's products. Moreover, TGP does not track each sale of its products by building project, and
11 often has no idea how its products are going to be used or what code governs. (Razwick Decl., ¶ 5)

12       In contrast to O'Keeffe's over broad building project interrogatory requests, TGP served one
13 similar interrogatory requesting a list of projects and corresponding revenue information for
14 SuperLite I-XL dating back to 2003. (*See* Dkt. 109-4, O'Keeffe's Motion Ex. 3 comparing
15 discovery requests) Again, although the parties' respective discovery requests appear similar, they
16 are not. O'Keeffe's uses an organized scheme directed at getting AHJs to approve the use of
17 SuperLite I-XL even though the product cannot satisfy the required hose stream test. TGP engages
18 in no comparable conduct aimed at convincing AHJs to consistently waive code requirements.

19     **E.**    <u>**TGP's Responses To O'Keeffe's Over Broad Building Project Requests**</u>

20       When the Court initially stayed discovery, document production had not yet begun. Once
21 the stay was lifted, the parties began the "meet and confer" process regarding pending discovery
22 requests. During these attempts to resolve the dispute, TGP requested an explanation of the factual
23 basis underlying O'Keeffe's vague contentions concerning FireLite®. O'Keeffe's persists with
24 empty assertions that TGP purportedly does not provide sufficient information regarding allowable
25 uses of its products.

26       On April 9, TGP served its first supplemental responses to O'Keeffe's RFPs, advising
27 O'Keeffe's that it will produce information located after a reasonable search pertaining to FireLite®

products in relation to radiant heat requirements applicable to those uses that O'Keeffe's identified in its counterclaim. On May 13, 2008, TGP supplemented its responses again, indicating that it has performed a reasonable search and has produced or will produce "documents and communications discovered in that search sent to or received from design professionals or AHJs that relate to the radiant heat, heat barrier, barrier to heat, or temperature rise (temp rise) performance of TGP's FireLite products, and that relate to using, or not using, FireLite as transoms, sidelights (sidelites), borrowed lights (lites), in fire doors, and in panels exceeding 100 sq. inches." (Siegel Decl., Ex. 1; TGP's 2nd Supp. RFP Responses; Ex. 2, TGP's 1st Supp. Interrogatory Responses). On May 13, 2008, TGP also made its second substantial document production, producing hundreds of communications, quote requests, quotes, and other documents related to sales of TGP's FireLite® products.

TGP's responses are consistent with the Rule 26 limitation that discovery must be related to a "claim or defense," and reasonably focuses discovery on the only discernable contentions that could provide a factual basis for O'Keeffe's counterclaims.

### F.    O'Keeffe's Code Compliance And Testing Requests

O'Keeffe's RFP No. 4 requests all documents related to whether TGP's FireLite® products comply with any building code, regulation, or standard. Each state, county, and municipality is responsible for its own building codes and regulations. TGP manufacturers glazing products and uses UL to test its products to national test standards that are referred to throughout the various building codes and regulations, in various ways. Because there is no national building code used verbatim throughout the country, it is entirely possible that a TGP product could comply with one state's building code, but perhaps not another. Addressing each building code is over broad and unduly burdensome. TGP's response that it will produce its product information sheets and UL listings is appropriate because that will identify with which national test standards TGP's products comply, and moreover is comparable to O'Keeffe's response to a similar document request regarding SuperLite I-XL: "O'Keeffe's refers to the texts of the codes listed in this request and the test reports produced pursuant to other requests. As it understands this request, it knows of no other

1   responsive data in its possession, custody or control."  (Siegel Decl., Ex. 3, O'Keeffe's Suppl. RFP
2   Responses at 4-5)
3         O'Keeffe's RFP No. 5 requests testing documents for TGP's FireLite® products; RFP No. 6
4   essentially requests all documents and communications with UL relating to the testing of *all* of
5   TGP's products.  Many of TGP's products are not identified in O'Keeffe's counterclaims.
6   Nonetheless, TGP has already produced hundreds of pages of documents responsive to these
7   requests, including test reports, UL listings, and communications between TGP and UL.  TGP's
8   Supplemental Responses indicate that it will produce responsive documents to RFP No. 5, and that it
9   will produce responsive documents to RFP No. 6, as to the products identified in O'Keeffe's
10  pleadings.  (*See* Siegel Decl., Ex. 1 at 10-13)

11      **G.**    **O'Keeffe's RFP Nos. 18-19, 21, And 25**

12        With its responses to O'Keeffe's RFP Nos. 18-19, 21, and 25, TGP was not trying to unduly
13  narrow or limit its production, but indicate what responsive materials TGP expected to produce.
14  TGP has supplemented its responses to these requests and has produced or will produce responsive
15  documents.  (*Id*. at 24-29)

16  **III.**    **ARGUMENT**

17        Fed. R. Civ. P. 26(c) authorizes a court to grant protective orders, for good cause shown, "to
18  protect a party or person from annoyance, embarrassment, oppression or undue burden or expense."
19  Fed. R. Civ. P. 26(c)(1).  The protective order may provide, among other things, that the disclosure
20  or discovery not be had or that the disclosure or discovery may be limited to certain matters.  *Id.*  A
21  party that seeks an order placing conditions on the taking of discovery, such as TGP here, faces a
22  lesser burden than a party seeking to prevent discovery altogether.  *In re Coordinated Pretrial*
23  *Proceedings in Petroleum Prods. Antitrust Litig*., 669 F.2d 620, 623 (10th Cir. 1982).  Here,
24  O'Keeffe's over broad requests should be limited to a proper scope under Rule 26(b) as tethered to
25  an actual claim or defense at issue in this action.
26        Three key areas in which O'Keeffe's is overreaching include asking for (1) all documents
27  related to *any building project*, regardless of whether there was anything improper about the project,
28

(2) all sales-related documents, comprised of redundant quotes, orders, invoices, confirmations, packing slips and the like, and (3) communications with UL related to whether *any TGP product passes or fails* any UL testing.

As indicated above and as TGP provided in its Supplemental Responses, a reasonable discovery scope would, at most, require production of documents and information concerning use of FireLite® products in relation to radiant heat transfer limitations applicable in the three instances specified by O'Keeffe's, listed above, and be further limited to the products identified in the pleadings.

### A. O'Keeffe's Inc.'s Over Broad Requests Should Be Limited To The Claims And Defenses Identified In The Pleadings

A court can limit discovery where it finds that "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2)(C)(iii). Here, in view of O'Keeffe's thinly pled claims and allegations, the likely benefit of O'Keeffe's proposed discovery is minimal compared to the scope of this oppressive discovery. *See Surles v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007) ("Although a plaintiff should not be denied access to information necessary to establish her claim, neither may a plaintiff be permitted to go fishing and a trial court retains discretion to determine that a discovery request is too broad and oppressive.") (internal citations omitted).

Fed. R. Civ. P. 26(b) limits discovery to matters that are "relevant to any party's *claim or defense*." Fed. R. Civ. P. 26(b)(1) (emphasis added). The Judicial Conference expressly narrowed Rule 26 in 2000 from the earlier provision that allowed discovery relevant to any "subject matter" in the litigation. *See* Advisory Committee Notes to 2000 Amendments, Fed. R. Civ. P. 26 ("ACN 2000"); *Thompson v. Dep't Of Housing and Urban Development*, 199 F.R.D. 168, 172 (D. Md. 2001) ("[U]nless expanded by the court for good cause shown, it is intended that the scope of discovery be narrower than it was, in some meaningful way."). In doing so, the Committee

"intend[ed] that the parties and the court *focus on the actual claims and defenses* involved in the action," and noted that "[t]he rule change signals to the court that it has the authority to confine discovery *to the claims and defenses asserted in the pleadings*." ACN 2000 (emphases added); *accord Thompson*, 199 F.R.D. at 171-72 ("Further, it seems clear that the most valuable reference to use in implementing the new change in the scope of discovery is the pleadings that have been filed, as that is where the claims and defenses are stated.").

O'Keeffe's suggestion that "the Supreme Court has addressed exactly the circumstance presented here" ignores these changes to Rule 26. In *Oppenhemier*, the Supreme Court rooted its analysis on the scope of discovery in the same language of Rule 26(b)(1) that the Conference later narrowed by amendment in 2000. *See Oppenheimer Fund, Inc. v. Saunders*, 437 U.S. 340, 351 (1978) ("*The key phrase* in this definition – '*relevant to the subject matter . . .*'-has been broadly construed . . . .") (emphasis added).[4] The Advisory Committee's own commentary on the rule change make clear that the narrowing 2000 amendments are intended to focus discovery on the actual claims and defenses in the action.

The Notes specifically explain that the Rules-amendment "is designed to involve the court more actively in regulating the breadth of sweeping and contentious discovery" like that here. ACN 2000. And, indeed, the court's involvement is needed to enforce the proscription, "signal[ed]" by "the rule change," that "the parties . . . have *no entitlement* to discovery to develop new claims or defenses that are not already identified in the pleadings." *Id.* (emphasis added). O'Keeffe's reliance on *Miller* to demand "an adequate opportunity to obtain information that would be useful," Dkt. 109

---

[4] *Miller v. Pancucci*, 141 F.R.D. 292 (C.D. Cal. 1992), cited in Dkt. 109 at 5, was also decided under the old Rule 26 prior to the narrowing amendment in 2000. O'Keeffe's reliance on *U.S. ex rel. Woodruff v. Hawaii Pac. Health*, No. CIV 05-00521 JMSLEK, 2008 WL 192980 (D. Haw. Jan. 23, 2008), Dkt. 109 at 5, is likewise misplaced. In *Woodruff*, the District Court relied on *Miller* and *Oppenheimer* based, apparently, on the idea that it could disregard the narrowing 2000 change to Rule 26(b)(1) because *2007 amendments* to Rule 26 were "intended to be stylistic only." *Woodruff*, 2008 WL 192980 at *6 & n.4. *Woodruff* gives no consideration to the actual language of Rule 26(b)(1), and like O'Keeffe's argument is contrary to the 2000 Advisory Committee Notes.

at 5, ignores the distinction between permissible discovery framed by the pleadings and an impermissible fishing expedition seeking to dredge up some basis for new (or defective) claims.

### 1.     O'Keeffe's Requests Are Over Broad And Oppressive

The gap between O'Keeffe's discovery requests, and the actual claims, is enormous.  While its requests seek practically any document related to any use of a FireLite® product, the pleadings are limited at most to only three alleged "uses" of FireLite® supposedly inconsistent with some unspecified radiant heat requirement, in some unspecified code, whose applicability is somehow misrepresented by some unspecified TGP representation.  (*E.g.,* Dkt. 28, ¶ 16)

O'Keeffe's has taken the position that responsive documents to the building project requests would include, among other things, estimates, bids, invoices, quotes, shipping confirmations, packing slips, etc. ("sales documents") regarding FireLite®.  (See Dkt. 102-9, Ritchey Decl., Ex. H). Exemplar TGP "sales documents" are submitted herewith for two different transactions.  (Razwick Decl., ¶8, Ex. A)  Such information would be burdensome to produce, redundant of each other, and do not contain the type of information O'Keeffe's would need to prove its claim.  Indeed, TGP's "sales" documents do not specify exactly where or how the TGP product is to be used, nor do they identify which building code will govern the particular application.  Nor will these documents otherwise show TGP approving or endorsing the use of its products for a known code violation.

Notwithstanding the lack of relevance of the documents, the full scope of the requested information is not reasonably accessible.  TGP's accounting system would potentially require manually entering thousands and thousands of document numbers so that responsive documents could be regenerated and printed. (Razwick Decl., ¶7)  Alternatively, TGP has hard copies of sales documents going back to 2004, but they are stored in more than 100 different boxes that are not grouped by product or project.  (*Id.*, ¶8)  These boxes contain sales documents on all of TGP's products, not just the ones mentioned in O'Keeffe's pleadings.  (*Id.*)

1   Specifically, there were more than 13,000 orders of FireLite®, Pyrodur™, and FireGlass®20
2   between 2004 and 2007[5] and TGP estimates that there would be in excess of 100,000 pages of sales-
3   related documents related to just these products. (*Id*., ¶6). Also, because TGP does not store
4   documents organized by product or project, there are likely in excess of 200,000 pages of hard
5   copies that would need to be reviewed in order to locate the responsive materials. (*See* Razwick
6   Decl., ¶6) Having attorneys and paralegals manually review more than 100 boxes of more than
7   200,000 pages of documents to find and copy redundant materials related to the products at issue
8   would be an unreasonably burdensome and expensive endeavor.

9   O'Keeffe's should not be allowed to rummage through so many TGP documents absent a
10  showing of need for such redundant and broad discovery that is tied to its claims and defenses.
11  However, if the Court grants O'Keeffe's Motion, then TGP would make available for inspection
12  hard copies of its sales documents, subject to O'Keeffe's paying for copying costs. *See Ruiz v. Ed*
13  *Richard Discing, Inc*., 2008 WL 1925203, *2 (N.D. Cal., Apr. 29, 2008) (ordering Plaintiff to pay
14  copying charges for the production of Defendant's documents).

15  The disputed interrogatories generally request the same type of building project information.
16  As noted above, O'Keeffe's Interrogatory Nos. 4, 8 seeks the identity of each building project and
17  practically every detail and document regarding each building project since 2003 for which the
18  FireLite® products have been sold. Interrogatory No. 9 seeks *generally* every "building project" that
19  "rejected" FireLite® "for failing to meet any building code" and every detail about such instances.
20  Interrogatory No. 9 is also over broad in that it is not limited in time, although O'Keeffe's
21  mistakenly argues that it is. (*See* Dkt. 109-3, Motion, Ex. 2 at 7-8). Interrogatory No. 11 seeks
22  identification of each "building project" for which standard or polished FireLite® has been sold for
23  use in fire doors. O'Keeffe's argues that "this request targets a specific example of the problem."

---

[5] O'Keeffe's has requested TGP to produce responsive building project documents back to the year 2000. However, TGP's sales documents from 2003 and earlier are stored electronically in a program that can be viewed on a single computer at TGP, and is not searchable by product or project. (Razwick Decl., ¶7)

(*Id.*). However, O'Keeffe's has not identified for what building code provision a problem is presented.

Other disputed requests go beyond the FireLite® products. O'Keeffe's Interrogatory Nos. 5-7 request the same broad array of information related to the Pyrodur™ and FireGlass®20 products. However, there is not even a single reference to Pyrodur™ anywhere in the pleadings. O'Keeffe's alleges in its Motion that TGP markets this product as providing radiant heat protection and for applications greater than 20 minutes with AHJ approval. (*Id*. at 3) However, just like the FireLite® products, TGP clearly discloses that Pyrodur™ is not a barrier to radiant heat. (Razwick Decl., ¶12, Ex. E) As for O'Keeffe's allegation as to FireGlass®20 (Dkt. No. 28, O'Keeffe's Counterclaim, ¶ 23(g)), the UL listing in question relates to a mere typographical error on the UL listing sheet for FireGlass®20 as opposed to any affirmative misrepresentation by TGP. UL's typographical has since been corrected. (*cf*. Razwick Decl., Exs. B, C with Dkt. No. 28, ¶ 23(g)). Another over broad example is RFP No. 6, which seeks TGP communications with UL related to whether any TGP product passes or fails UL testing.

O'Keeffe's oppressive requests seek documents and information regardless of relevancy or need. The claims do not allege, and despite TGP's efforts to identify reasonable limits on discovery during several meet and confers, O'Keeffe's could not identify, *any* actual TGP misrepresentation, to *any* actual "consumer," nor *any* actual building code violation relating to some improper use of the FireLite® products. O'Keeffe's requests are, quite simply, untethered to the actual claims or defenses, far exceeding the scope permitted by Rule 26(b)(1). On that basis alone the discovery should be curtailed. *See Surles v. Air France*, No. 00CIV5004 (RMBFM), 2001 WL 1142231, *1-2 (S.D.N.Y. Sep. 27, 2001) (finding no factual basis for speculative discovery). O'Keeffe's speculation does not justify discovery, nor render the subject of its discovery relevant under Rule 26(b)(1). *Id.*, 2001 WL 1142231 at *2 (collecting cases).

### 2. O'Keeffe's Attempts To Clarify Its Allegations Also Fail To Support Broad Discovery

Notwithstanding that O'Keeffe's counterclaims fail to justify the broad discovery,

O'Keeffe's attempts to clarify its allegations through the meet and confer process also fail. O'Keeffe's suggests that it "has provided numerous examples to TGP during the meet and confer regarding what O'Keeffe's contends false/misleading statements on TGP's website" and that its requests are "narrowly tailored." (Dkt. No. 109, Motion at 7:21-24.) O'Keeffe's cites Ritchey Decl. Ex. H as where O'Keeffe's supposedly provided actual examples of improper TGP conduct. However, the three examples provided do not justify broad discovery.

For example, O'Keeffe's suggests that there is something improper with TGP's marketing of its 60/90-minute rated FireLite® products because, according to O'Keeffe's, a 60/90-minute FireLite® product can only go where 45-minute rated products can go. (Ritchey Decl., Ex. H). However, O'Keeffe's acknowledged in the same email that there <u>are</u> "limited applications" for a 60 or 90 minute fire protective product. Moreover, the IBC provides for applications where a 45-minute rating is the <u>minimum</u> rating for fire-rated glass in several applications, explicitly contemplating that products that have a higher rating, such as 60 or 90 minutes, are permitted. (*See* Siegel Decl., Ex. 4 at 107-09). And, as mentioned above, UL explicitly lists FireLite® with 60 and 90 minute ratings. (*See supra* n. 3)

The next supposed example was that TGP does not disclose that a 45-minute rated window can be used as a borrowed lite in a 60-minute partition only if it does not exceed 25% of the surface area. (Ritchey Decl., Ex. H). O'Keeffe's has cited no code or regulation that would require such detailed disclosure.

The final so-called example was that "TGP's website states that WireLite complies with ANSI Z97.1, which relates to impact ratings that WireLite does not have." (Ritchey Decl., Ex. H). Not true. TGP does not market WireLite™ as complying with ANSI Z97.1; it does, however, appropriately market WireLite™ NT as satisfying ANSI Z97.1. (Razwick Decl., ¶ 11, Ex. D)

### 3. Discovery Should Be Limited As Stated In TGP's Supplemental Responses

The courts recognize that limited and staged discovery is a correct solution to oppressive discovery, under Rule 26(b)(2), calling for material of marginal or no relevance under Rule 26(b)(1).

1  *See, e.g., Thompson*, 199 F.R.D. at 172.  O'Keeffe's requests should be limited accordingly.  TGP
2  has offered reasonable searches and production of material in view of O'Keeffe's claims and
3  defenses.  And, TGP has already produced to O'Keeffe's thousands of pages of documents,
4  including hundreds of highly confidential communications with customers relating to uses or
5  potential uses of TGP's FireLite® products.
6      Reasonable limitations regarding the disputed requests can be summarized as follows:
7  **Building Project Requests  (RFP Nos.  1-3, 10, 12**, and **Interrogatory Nos. 4-9, 11)**
8      The FireLite® building project requests (RFP Nos.  1-3, 10, 12, and Interrogatory Nos. 4, 8-9,
9  11) should be limited to information obtained as a result of TGP's reasonable search for documents
10  and communications sent to or received from design professionals or AHJs that relate to the radiant
11  heat, heat barrier, barrier to heat, or temperature rise (temp rise) performance of TGP's FireLite®
12  products, and that relate to using, or not using, FireLite® as transoms, sidelights (sidelites), borrowed
13  lights (lites), in fire doors, and in panels exceeding 100 sq. inches.  To the extent O'Keeffe's can
14  identify actual uses of FireLite® that violated some identified building code after reviewing TGP's
15  production, TGP will then provide revenue information requested in Interrogatory No. 8 related to
16  the identified improper uses.
17      **Interrogatory Nos. 5-7** relate to Pyrodur™ , which was not mentioned in O'Keeffe's
18  counterclaims, and FireGlass®20, for which UL has since corrected typographical error regarding the
19  FireGlass®20 listing.  TGP should not have to respond to the building project related- interrogatories
20  as to Pyrodur™ and FireGlass®20, at least until O'Keeffe's presents some legitimate reason why it
21  would be entitled to such discovery.
22  **Code Compliance and Testing Requests  (RFP Nos. 4, 6)**
23      **RFP No. 4** regarding code compliance should be limited to the UL listings and test report
24  information, which is consistent with O'Keeffe's response to a similar RFP.
25      **RFP No. 6** regarding communications with UL, should be limited to the products identified
26  in O'Keeffe's counterclaims, namely FireLite®, FireGlass®20, Pyroshield™ NT, and WireLite™.
27
28

1  Further discovery beyond this is unwarranted unless and until O'Keeffe's can justify more
2  extensive disclosure based on the results of this initial examination. *Thompson*, 199 F.R.D. at 172.

3  **B.    TGP Has Not Waived Its Objections**

4  O'Keeffe's also argues that TGP has waived certain objections. For example, although
5  O'Keeffe's identifies TGP's privilege objection, it notes that TGP has indicated that it will be
6  provide a privilege log to the extent TGP locates any responsive information that is privileged. Also,
7  TGP's privilege objections are in response to extremely broad requests for information that may
8  involve the interpretation of building codes, and only "to the extent" the requests seek protected
9  information.

10 **IV.   CONCLUSION**

11  O'Keeffe's has been unable to provide a single example of an improper FireLite® installation
12  as alleged in its counterclaims even though its counterclaims seem to contend that such improper
13  installation is so pervasive as to pose "immediate health and safety risks to both users and public."
14  (Dkt. 28, O'Keeffe's Counterclaim, ¶ 15) If O'Keeffe's has any factual basis for its contentions,
15  then it should identify examples so that discovery can be framed within a reasonable scope.
16  Accordingly, the Court should deny O'Keeffe's Motion and issue a protective order under Rule
17  26(c) limiting discovery to the reasonable search set forth in TGP's supplemental responses.

19  Dated this 13TH day of May, 2008.

By:    /s/Todd M. Siegel
Jeffrey S. Love (State Bar No. 195068)
jeffrey.love@klarquist.com
Todd M. Siegel (*Pro Hac Vice*)
todd.siegel@klarquist.com
Klarquist Sparkman, LLP
121 S.W. Salmon Street, Suite 1600
Portland, OR  97204-2988
Telephone:  (503) 595-5300
Facsimile:  (503) 595-5301

Eric L. Wesenberg (State Bar No. 139696)
ewesenberg@orrick.com

1  Gabriel M. Ramsey (State Bar No. 209218)
   gramsey@orrick.com
2  Orrick, Herrington & Sutcliffe LLP
   1000 Marsh Road
3  Menlo Park, CA 94025-1015
   Telephone: (650) 614-7400
4  Facsimile: (650) 614-7401

5  Attorneys for Defendant Technical Glass Products

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28